WHITE & CASE LLP

1155 Avenue of the Americas

New York, New York 10036-2787

Telephone: (212) 819-8200

Facsimile: (212) 354-8113

Scott Greissman, Esq.

633 West Fifth Street, Suite 1900

Los Angeles, California 90071-2007

Telephone: (213) 620-7700

Facsimile: (213) 452-2329

Roberto J. Kampfner, Esq.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re | ) | Chapter 15 |
| | ) | |
| COMPANIA MEXICANA DE AVIACION, S.A. de C.V., | ) | Case No. 10-14182 (MG) |
| | ) | |
| Debtor in a Foreign Proceeding. | ) | |
| | ) | |
| | ) | |

**AMENDED REDACTED VERSION OF EMERGENCY MOTION OF
INTERNATIONAL LEASE FINANCE CORPORATION, WHITNEY IRELAND
LEASING LIMITED AND CALLIOPE LIMITED FOR RELIEF FROM TEMPORARY
RESTRAINING ORDER, FOR A DETERMINATION THAT CERTAIN LEASE
AGREEMENTS ARE TERMINATED, FOR A DETERMINATION THAT THE
AUTOMATIC STAY IS NOT APPLICABLE IF AN ORDER IS ENTERED
RECOGNIZING THE CONCURSO PROCEEDING AS A FOREIGN MAIN
PROCEEDING AND OBJECTION TO THE IMPOSITION OF A PRELIMINARY
<u>INJUNCTION</u>**

International Lease Finance Corporation, Whitney Ireland Leasing Limited and Calliope

Limited (collectively, the "ILFC Group"), hereby file this redacted version of its (a) emergency

motion for entry of an order (i) granting relief from the Second Amended Order to Show Cause

with Temporary Restraining Order entered by this Court on August 5, 2010 in the above-

captioned case (the "TRO") pursuant to paragraphs 12 and 16 of the TRO, (ii) declaring that

certain lease agreements are terminated and (iii) declaring that to the extent this Court enters an

order recognizing the Concurso Proceeding (as defined below) as a "foreign main proceeding", the automatic stay is inapplicable to the ILFC Group and its aircraft and (b) objection to the imposition of a preliminary injunction (collectively, the "Motion"), and in regards thereto, respectfully represents as follows:

## PRELIMINARY STATEMENT

1.      On August 3, 2010, this Court entered a temporary restraining order providing that the protections of section 362 of the Bankruptcy Code apply to Compañía Mexicana de Aviación, S.A. de C.V. ("Mexicana") and its assets in the United States based on a finding, among other things, that "any hardship to parties [effected by the order] is outweighed by the benefits to Mexicana and the Concurso Proceeding of the relief requested." TRO, § 2. This finding, however, is patently incorrect as to the ILFC Group.

2.      The ILFC Group is a lessor of eight aircraft to Mexicana, all of which are currently in the possession of Mexicana and presumably transporting passengers and/or cargo. Prior to the filing of Mexicana's bankruptcy petition, Mexicana breached its obligations to the ILFC Group to pay rent, maintenance reserves, refurbishment fees and other amounts due under Mexicana's leases with the ILFC Group. On July 23, 2010, the ILFC Group sent Mexicana notices of termination, which terminated Mexicana's rights under the lease agreements and demanded (a) payment in full of all amounts due thereunder, (b) an immediate grounding of each of the subject aircraft, and (c) the return of the aircraft to the ILFC Group. Mexicana, however, has not paid the outstanding sums, grounded the aircraft or returned the aircraft. In short, Mexicana continues to operate the ILFC Group's aircraft, although it has no legal right to do so.

3.      Despite the fact that the lease agreements regarding the ILFC Group's aircraft were terminated pre-petition, the TRO provides for the imposition of the automatic stay as to the ILFC Group's aircraft. The TRO should be dissolved because Mexicana has no colorable claim to the ILFC Group's aircraft, and thus, the imposition of the TRO does nothing to protect any legitimate property interest of Mexicana. To the contrary, it permits Mexicana to continue to fly aircraft it has no right to fly with impunity. Upon the delivery of the notices of termination of

the lease agreements to Mexicana, the ILFC Group canceled the lease agreements both by their terms and under California law, which governs the lease agreements. Further, it is a well-established principle of bankruptcy law that the filing of a bankruptcy petition cannot revive a lease that was terminated prior to the commencement of a case. While Mexicana would like this Court to believe otherwise, Mexicana will not be irreparably harmed if the ILFC Group is permitted to exercise its remedies as to its aircraft because Mexicana has no legal or equitable interest therein.

4.      The same cannot be said for the ILFC Group. At this very moment, Mexicana is in unlawful possession of the ILFC Group's aircraft and continues to fly them without paying rent or funding required maintenance reserves. Further, the ILFC Group is unable to verify whether or not the aircraft are being properly maintained. Mexicana cannot continue to improperly possess the ILFC Group's aircraft, and the TRO should be dissolved to permit the ILFC Group to repossess its aircraft.

5.      The ILFC Group further objects to the imposition of a preliminary injunction to the extent it seeks to apply the automatic stay to the ILFC Group's aircraft. For the reasons set forth above, the automatic stay is clearly not applicable to the ILFC Group's aircraft and it would be contrary to both California and bankruptcy law to order otherwise. As such, to the extent a preliminary injunction is issued, the injunction must carve out the ILFC Group and its aircraft as an exception to the applicability of the automatic stay. Moreover, to the extent this Court enters an order recognizing the Concurso Proceeding as a "foreign main proceeding" within the meaning of Chapter 15 of the Bankruptcy Code, the ILFC Group asserts that, for the reasons stated herein, the order should expressly provide that the automatic stay of section 362 of the Bankruptcy Code does not apply to the ILFC Group and the aircraft.

## BACKGROUND

### A.      The Chapter 15 Filing

6.      On August 2, 2010 (the "Petition Date"), Maru E. Johnson (the "Foreign Representative"), in her capacity as the foreign representative of Mexicana, filed a petition (the

"Petition") in this Court under Chapter 15 of Title 11 of the United States Code (the "Bankruptcy Code") for recognition of Mexicana's corporate reorganization "Concurso Proceeding" pending in the District Court for Civil Matters for The Federal District, Mexico (the "Concurso Proceeding") as a "foreign main proceeding."

7.      That same day, the Foreign Representative also caused to be filed an Ex Parte Application for Order (A) Granting Provisional Relief and Injunction and (B) Scheduling Hearing (the "Application").  In the Application, the Foreign Representative seeks: (a) recognition of the Concurso Proceeding as a "foreign main proceeding"; (b) recognition of the Foreign Representative as a "foreign representative"; (c) the immediate entry, without a hearing, of an order to show cause with a temporary restraining order providing that, among other things, the automatic stay of section 362 of the Bankruptcy Code applies to this proceeding until the time that an order is entered by this Court recognizing the Concurso Proceeding as a "foreign main proceeding"; and (d) after a hearing on ten (10) days' notice (to the extent any unresolved objections exist), the issuance of a preliminary injunction providing the same relief as that sought in the TRO.

8.      By order entered on August 2, 2010, the Application was granted, which order was modified by the entry of an Amended Order to Show Cause with Temporary Restraining Order (the "Amended Order") on August 3, 2010.  Pursuant to the Amended Order, "the protections of section 362 of the Bankruptcy Code appl[y] to Mexicana and its assets in the United States."  TRO, ¶ 3.

**B.      The Aircraft**

9.      The ILFC Group is in the business of leasing airplanes to airline companies. International Lease Finance Corporation ("ILFC") owns four Airbus A319-100 aircraft, bearing manufacturer's serial numbers 1866 (the "1866 Aircraft"), 1872 (the "1872 Aircraft"), 1882 (the "1882 Aircraft") and 1925 (the "1925 Aircraft").  Affidavit of Joseph Hermosillo ("Hermosillo Aff."), ¶¶ 3; 5-8, Exs. A-D.  ILFC also owns an Airbus A320-200 aircraft, bearing manufacturer's serial number 3123 (the "3123 Aircraft").  Hermosillo Aff., ¶ 3; 12, Ex. E.

10.     Whitney Leasing Limited ("Whitney Leasing"), a subsidiary of ILFC, owns two Airbus A319-100 aircraft, bearing manufacturer's serial numbers 3790 (the "3790 Aircraft") and 4275 (the "4275 Aircraft"). Hermosillo Aff., ¶ 4; 28-30 Exs. M-N. Additionally, Sierra Leasing Limited ("Sierra"), a subsidiary of ILFC, owns one Airbus A319-100 aircraft, bearing manufacturer's serial number 2126 (the "2126 Aircraft" and, together with the 1866 Aircraft, 1872 Aircraft, 1882 Aircraft, 1925 Aircraft, 3123 Aircraft, 3790 Aircraft and 4275 Aircraft, the "Aircraft").[1] Hermosillo Aff., ¶ 43; 44, Ex. V.

    i)      **The 1866 Aircraft, 1872 Aircraft, 1882 Aircraft, 1925 Aircraft and 3123 Aircraft**

11.     On or about April 19, 2002, ILFC and Mexicana entered into an Aircraft Lease Agreement (the "1866 Lease"). Hermosillo Aff., ¶ 5, Ex. A. By the terms of the 1866 Lease, Mexicana agreed to lease the 1866 Aircraft from ILFC from the date of delivery, December 12, 2002, through and including March 1, 2009. Id. Pursuant to the 1866 Lease, ILFC delivered the 1866 Aircraft to Mexicana on December 12, 2002. Id.

12.     On or about April 19, 2002, ILFC and Mexicana entered into an Aircraft Lease Agreement (the "1872 Lease"). Hermosillo Aff., ¶ 6, Ex. B. By the terms of the 1872 Lease, Mexicana agreed to lease the 1872 Aircraft from ILFC from the date of delivery, December 18, 2002, through and including March 17, 2009. Id. Pursuant to the 1872 Lease, ILFC delivered the 1872 Aircraft to Mexicana on December 18, 2002. Id.

13.     On or about April 19, 2002, ILFC and Mexicana entered into an Aircraft Lease Agreement (the "1882 Lease"). Hermosillo Aff., ¶ 7, Ex. C. By the terms of the 1882 Lease, Mexicana agreed to lease the 1882 Aircraft from ILFC from the date of delivery, January 21, 2003, through and including April 20, 2009. Id. Pursuant to the 1882 Lease, ILFC delivered the 1882 Aircraft to Mexicana on January 21, 2003. Id.

---

[1]     The term "Aircraft" as utilized herein shall be construed as encompassing the Airframe, Engines, Parts and Aircraft Documentation associated with the 2126 Aircraft, 1866 Aircraft, 1872 Aircraft, 1882 Aircraft, 1925 Aircraft, 3123 Aircraft, 3790 Aircraft and 4275 Aircraft, as those terms are defined in the Leases (as defined herein).

14.     On or about April 19, 2002, ILFC and Mexicana entered into an Aircraft Lease Agreement (the "1925 Lease"). Hermosillo Aff., ¶ 8, Ex. D.  By the terms of the 1925 Lease, Mexicana agreed to lease the 1925 Aircraft from ILFC from the date of delivery, February 27, 2003, through and including May 26, 2009.  Id.  Pursuant to the 1925 Lease, ILFC delivered the 1925 Aircraft to Mexicana on February 27, 2003.  Id.  Collectively, the 1866 Lease, the 1872 Lease, the 1882 Lease, and the 1925 Lease are hereinafter referred to as the "2002 Leases."

15.     Pursuant to the 2002 Leases, among other obligations, Mexicana agreed:

a.     To pay base rent, monthly in advance, in the amount of US$XXX per Aircraft (expressed in January 1, 2001, dollars, as increased in accordance with the aircraft manufacturer's announced escalation rates for the period from and including January 1, 2001, through and including the delivery date of the Aircraft) per month for the first 12 months of the 2002 Leases (Article 5.3);

b.     To pay base rent, monthly in advance, in the amount of US$XXX (expressed in January 1, 2001, dollars, as increased in accordance with the aircraft manufacturer's announced escalation rates for the period from and including January 1, 2001, through and including the delivery date of the Aircraft) per Aircraft per month for months 13 through 24 of the 2002 Leases (Article 5.3);

c.     To pay base rent, monthly in advance, in the amount of US$XXX (expressed in January 1, 2001, dollars, as increased in accordance with the aircraft manufacturer's announced escalation rates for the period from and including January 1, 2001, through and including the delivery date of the Aircraft) per Aircraft per month for months 25 through 36 of the 2002 Leases (Article 5.3);

d.     To pay base rent, monthly in advance, in the amount of US$XXX (expressed in January 1, 2001, dollars, as increased in accordance with the aircraft manufacturer's announced escalation rates for the period from and including January 1, 2001, through and including the delivery date of the Aircraft) per Aircraft per month for months 37 through 48 of the 2002 Leases (Article 5.3);

e.    To pay base rent, monthly in advance, in the amount of US$XXX (expressed in January 1, 2001, dollars, as increased in accordance with the aircraft manufacturer's announced escalation rates for the period from and including January 1, 2001, through and including the delivery date of the Aircraft) per Aircraft per month for months 49 through 75 of the 2002 Leases (Article 5.3);

f.    To pay a non-refundable refurbishment fee of US$XXX per hour flight logged on each Aircraft covered by the 2002 Leases, payable monthly in arrears (Article 5.4);

g.    To pay default interest at the prime rate plus XXX percent (XXX%) on all late payments due under the lease from the date upon which such payment was due, until the date on which such payment was received by ILFC's bank, or if Mexicana misses three consecutive payments on the due dates under a 2002 Lease, interest at the prime rate plus XXX percent (XXX%) from the date upon which such payment was due, until the date on which such payment was received by ILFC's bank, all such interest to accrue on a day-to-day basis and be compounded monthly (Article 5.6);

h.    That on the occurrence and during the continuance of an event of a default under a 2002 Lease, ILFC may terminate the lease and require Mexicana, by notice,  to immediately return the Aircraft pertaining to that lease to ILFC at a location it chooses (Article 24.3); and

i.    That the prevailing party in any legal action arising from a 2002 Lease shall be entitled to recover reasonable attorneys' fees and other costs incurred in such action, plus pre- and post-judgment interest (Article 26.4).  Hermosillo Aff., Exs. A-D.

16.    Additionally, an integral component of the 2002 Leases is a requirement (in Article 22.9 of these leases) that Mexicana pay at the return of the aircraft a cash reimbursement for all or a portion of the cost of the unperformed maintenance attributable to Mexicana's use of the aircraft, as follows (collectively, the "2002 Leases Top-Ups"):

a.    an amount equal to (i) fifty percent (50%), multiplied by (ii) the product of the number of calendar days consumed on the Aircraft at return since the last "4C/5Y" check

multiplied by a "4C/5Y" check cost per day calculated as follows: such "4C/5Y" check price per day will be the quotient obtained by dividing (a) the expected cost of the next 4C/5Y check by (b) the full allotment of days between "4C/5Y" checks on the Aircraft as approved by the MPD;

b.      an amount equal to the number of hours consumed on each Engine at return since the last full performance restoration shop visit multiplied by a full performance restoration shop visit cost per hour calculated as follows: such full performance restoration shop visit cost price per hour will be the quotient obtained by dividing (i) the expected cost of the next full performance restoration shop visit by (ii) the full allotment of hours between scheduled removals as anticipated by the Engine manufacturer's estimated mean time between removals;

c.      an amount equal to the product of (a) the quotient obtained by dividing (i) the cycles consumed on each life-limited Part within an Engine by (ii) the total life of each such life-limited Part (according to the Engine manufacturer's published data) multiplied by (b) the replacement cost of the applicable life-limited Part;

d.      an amount equal to (i) fifty percent (50%), multiplied by (ii) the product of the number of hours/cycles/days (whichever is the more limiting factor) consumed on each Landing Gear since the last Overhaul multiplied by a Landing Gear Overhaul cost per hour/cycle/day calculated as follows: such Landing Gear Overhaul cost price per hour/cycle/day will be the quotient obtained by dividing (a) the expected cost of the next Landing Gear Overhaul by (b) the full allotment of hours/cycles/days between scheduled Overhauls for such Landing Gear as approved by the MPD.

17.      On or about June 29, 2006, ILFC and Mexicana entered into an Aircraft Lease Agreement (the "3123 Lease"). Hermosillo Aff., ¶ 12, Ex. E. By the terms of the 3123 Lease, Mexicana agreed to lease the 3123 Aircraft from ILFC from the date of delivery, May 24, 2007, through and including May 23, 2017. Id.

18.      Pursuant to the 3123 Lease, among other obligations, Mexicana agreed:

a.      To pay base rent, monthly in advance, in the amount of US$XXX per month for the term of the 3123 Lease (Article 5.3).

b.      To pay periodic reserves, subject to an annual escalation rate of XXX% (compounded yearly) on each one-year anniversary of the delivery date (Article 5.4).

c.      To pay default interest at the prime rate plus XXX percent (XXX%) on all late payments due under the lease from the date upon which such payment was due, until the date on which such payment was received by ILFC's bank, or if Mexicana misses three consecutive payments on the due dates under the 3123 Lease, interest at the prime rate plus XXX percent (XXX%) from the date upon which such payment was due, until the date on which such payment was received by ILFC's bank, all such interest to accrue on a day-to-day basis and be compounded monthly (Article 5.6); and

d.      That on the occurrence and during the continuance of an event of a default under a 2002 Lease, ILFC may terminate the lease and require Mexicana, by notice, to return the 3123 Aircraft to ILFC at a location it chooses (Article 25.3). Hermosillo Aff., Ex. E.

19.      On February 7, 2008, ILFC and Mexicana entered into amendments of each individual 2002 Lease (collectively "Amendment #1"). Hermosillo Aff., ¶ 16, Exs. F-I. Pursuant to Amendment #1, the term of each 2002 Lease was extended and the monthly rent for those extensions was set as follows:

| Aircraft | Extension | Expiration Date | Extension Period Rent (per month) | Refurbishment Fee (per flight hour) |
|---|---|---|---|---|
| 1866 Aircraft | 37 Months | 4/11/12 | US$XXX | $XXX |
| 1872 Aircraft | 37 Months | 4/17/12 | US$XXX | $XXX |
| 1882 Aircraft | 60 Months | 4/20/14 | US$XXX | $XXX |
| 1925 Aircraft | 56 Months | 1/26/14 | US$XXX | $XXX |

Hermosillo Aff., ¶ 17, Exs. F-I.

20.      Mexicana failed to pay rent and satisfy its obligations under the 2002 Leases and, accordingly, was and is in breach of those agreements. Additionally, Mexicana failed to pay rent and satisfy its obligations under the 3123 Lease and, accordingly, was and is in breach of that agreement.

21.      On November 9, 2009, ILFC and Mexicana entered into an amendment of the four 2002 Leases, the 3123 Lease, and another lease (the "Global Amendment #1"). Hermosillo

Aff., ¶ 18, Ex. J.  Global Amendment #1 acknowledged Mexicana's defaults in making payments under the 2002 Leases and the 3123 Lease (as of November 9, 2009) as follows:

| Lease | Indebtedness Including Interest |
| --- | --- |
| 1866 Lease | US$734,064.98 |
| 1872 Lease | US$837,741.23 |
| 1882 Lease | US$846,711.32 |
| 1925 Lease | US$843,310.93 |
| 3123 Lease | US$1,053,626.05 |

Hermosillo Aff., ¶¶ 18-20, Ex. J.

22.     Global Amendment #1 sets an amortization schedule for Mexicana to pay down the total indebtedness under the 3123 Lease and the 2002 Leases, and institutes an interest rate of ten percent per annum on outstanding indebtedness.  Hermosillo Aff., ¶ 19, Ex. J.  ILFC agreed under Global Amendment #1 that none of the defaults of the 3123 Lease and the 2002 Leases specified therein would be deemed to be an event of default under the respective leases, so long as Mexicana fulfilled its obligations under Global Amendment #1.  Hermosillo Aff., ¶ 20, Ex. J.  Moreover, ILFC and Mexicana expressly agreed in Global Amendment #1 that, notwithstanding Global Amendment # 1, all of ILFC's rights and remedies under the 3123 Lease and the 2002 Leases were reserved.  Hermosillo Aff., ¶ 20, Ex. J.

23.     On April 26, 2010, ILFC and Mexicana entered into an amendment of Global Amendment #1 ("Global Amendment #2").  Hermosillo Aff., ¶ 22, Ex. K.  Global Amendment #2 modified Mexicana's acknowledgment of defaults, in Global Amendment #1, in making payments under the 3123 Lease and the 2002 Leases, and modified the indebtedness of the 3123 Lease and the 2002 Leases, as of April 26, 2010, as follows:

| Lease | Indebtedness Including Interest |
| --- | --- |
| 1866 Lease | US$1,011,420.13 |
| 1872 Lease | US$1,114,990.19 |

| | |
|---|---|
| 1882 Lease | US$1,126,965.32 |
| 1925 Lease | US$1,123,550.37 |
| 3123 Lease | US$1,528,828.22 |

Hermosillo Aff., ¶¶ 22-23, Ex. K.

24.     Global Amendment #2 also modified the amortization schedule for Mexicana to pay down the total indebtedness under Global Amendment #1 at the interest rate of ten percent per annum, but otherwise preserved ILFC's rights as described in Global Amendment #1. Hermosillo Aff., ¶ 23, Ex. K.  Mexicana failed to make the payments to which it agreed in Global Amendment #1 as modified by Global Amendment #2.  Hermosillo Aff., ¶ 24, Ex. K.

25.     On June 23, 2010, Joseph H. Hermosillo, Senior Vice President of ILFC, signed a Notice of Default and Payment Demand (the "Notice of Default").  Hermosillo Aff., ¶¶ 25-26, Ex. L.  The Notice of Default was delivered to Mexicana's offices on June 24, 2010.  Id.  The Notice of Default cited Mexicana's failure to make payments of monthly rent, refurbishment fees, default interest, and other obligations under the 3123 Lease and the 2002 Leases, and per Global Amendment #1, as modified by Global Amendment #2, as follows:

| Lease | Indebtedness Including Interest |
|---|---|
| 1866 Lease | US$278,051.61 |
| 1872 Lease | US$277,969.70 |
| 1882 Lease | US$280,964.33 |
| 1925 Lease | US$280,930.92 |
| 3123 Lease | US$467,142.76 |
| Global Amendment # 1 | US$579,823.00 |

Hermosillo Aff., ¶ 25, Ex. L.

26.     The Notice of Default demanded that Mexicana satisfy, within 5 business days, its delinquencies under the obligations specified therein, together with the increased interest rate of ten percent under Global Amendment #1.  Hermosillo Aff., ¶ 26, Ex. L.

27.     Mexicana failed to cure its defaults as outlined in the Notice of Default within five (5) business days.  Hermosillo Aff., ¶ 27, Ex. L.  As of the date of the filing of this Motion, Mexicana remains in breach of the 3123 Lease and the 2002 Leases.

28.     On July 23, 2010, ILFC sent Mexicana a notice of termination and payment demand, terminating Mexicana's rights under the 3123 Lease and the 2002 Leases, demanding an immediate grounding of each of the 1866 Aircraft, the 1872 Aircraft, the 1882 Aircraft, the 1925 Aircraft and the 3123 Aircraft, and demanding that Mexicana return the 1866 Aircraft, the 1872 Aircraft, the 1882 Aircraft, the 1925 Aircraft and the 3123 Aircraft to Miami International Airport no later than 12:00 p.m. on July 26, 2010 (the "3123 Lease and 2002 Leases Termination Notice").  Affidavit of Chris Wallraff ("Wallraff Aff."), ¶¶ 4-5, Ex. A.

29.     Mexicana has not returned the 1866 Aircraft, the 1872 Aircraft, the 1882 Aircraft, the 1925 Aircraft or the 3123 Aircraft to ILFC, and Mexicana has indicated that it will not immediately return these aircraft to ILFC.  Moreover, Mexicana has not informed ILFC of the location of the 1866 Aircraft, the 1872 Aircraft, the 1882 Aircraft, the 1925 Aircraft or the 3123 Aircraft, and ILFC believes that Mexicana has not grounded any of these aircraft and continues to operate them.  Wallraff Aff., ¶ 7; Hermosillo Aff., ¶ 27.

30.     As of July 23, 2010, Mexicana is in default of payments under the 3123 Lease and the 2002 Leases, as amended, in an amount of approximately US$4,024,104.15, plus interest.  Wallraff Aff., ¶ 4; Ex. A; Affidavit of Elizabeth Critch ("Critch Aff."), ¶ 16, Ex. G.

ii)     **The 3790 Aircraft and the 4275 Aircraft**

31.     Whitney Leasing owns two Airbus A319-100 aircraft, bearing manufacturer's serial numbers 3790 (the "3790 Aircraft") and 4275 (the "4275 Aircraft").  Hermosillo Aff., ¶ 28; Exs. M-N.

32.     On or about February 21, 2008, ILFC and Mexicana entered into an Aircraft Lease Agreement (the "3790 Lease").  Hermosillo Aff., ¶ 29; Ex. M.  By the terms of the 3790 Lease, Mexicana agreed to lease the 3790 Aircraft from ILFC for nine years after the date of delivery, which was provided in the 3790 Lease as February 2009.  Id.

33.     On or about February 21, 2008, ILFC and Mexicana entered into an Aircraft Lease Agreement (the "4275 Lease").  Hermosillo Aff., ¶ 30; Ex. N.  By the terms of the 4275 Lease, Mexicana agreed to lease the 4275 Aircraft from ILFC for nine years after the date of delivery, which was provided in the 4275 Lease as April 2010.  Id.

34.     Collectively, the 3790 Lease and the 4275 Lease are hereinafter referred to as the "2008 Leases."  Both 2008 Leases involved future delivery of the Aircraft.

35.     Pursuant to the 2008 Leases, among other obligations, Mexicana agreed:

a.     To pay base rent, monthly in advance, in the amount of US$XXX per Aircraft (expressed in January 1, 2007, dollars, as increased in accordance with the aircraft manufacturer's announced escalation rates for the period from and including January 1, 2007, through and including the delivery date of the Aircraft) (Article 5.3);

b.     To pay periodic reserves, subject to an annual escalation rate of XXX% (compounded yearly) on each one-year anniversary of the delivery date (Article 5.4);

c.     To pay default interest at the prime rate plus XXX percent (XXX%) on all late payments due under the lease from the date upon which such payment was due, until the date on which such payment was received by ILFC's bank, or if Mexicana missed three consecutive payments on the due dates under the 2008 Leases, interest at the prime rate plus XXX percent (XXX%) from the date upon which such payment was due, until the date on which such payment was received by ILFC's bank, all such interest to accrue on a day-to-day basis and be compounded monthly (Article 5.6);

d.     That on the occurrence and during the continuance of an event of a default under a 2008 Lease, ILFC may terminate the lease and require Mexicana, by notice, to immediately return the Aircraft pertaining to that lease to ILFC at a location it chooses (Article 25.3); and

e.     That the prevailing party in any legal action arising from a 2008 Lease shall be entitled to recover reasonable attorneys' fees and other costs incurred in such action, plus pre- and post-judgment interest (Article 25.6).  Hermosillo Aff., ¶ 31; Exs. M-N.

36.     On February 17, 2009, ILFC assigned the 3790 Lease to Whitney Ireland Leasing Limited ("Whitney Ireland Leasing"), a subsidiary of ILFC.  Hermosillo Aff., ¶ 33; Ex. O.

37.     Pursuant to the 3790 Lease, Whitney Ireland Leasing delivered the 3790 Aircraft to Mexicana on February 17, 2009.  Hermosillo Aff., ¶ 29.

38.     On March 12, 2009, Whitney Ireland Leasing and Mexicana entered into an amendment of the 3790 Lease ("3790 Amendment #2").[2]  Hermosillo Aff., ¶ 34; Ex. P.  The 3790 Amendment #2 changed the monthly rent of the 3790 Aircraft to US$XXX per month.  Id.

39.     On April 7, 2010, Whitney Ireland Leasing and Mexicana entered into another amendment of the 3790 Lease ("3790 Amendment #3").  Hermosillo Aff., ¶ 35; Ex. Q.  The 3790 Amendment #3 acknowledges Mexicana's default for failure to pay its outstanding balance under the 3790 Lease in the amount of US$917,063.  Id.  The 3790 Amendment #3 set an amortization schedule for Mexicana to pay down the total indebtedness under the Lease, and institutes an interest rate of ten percent per annum on outstanding indebtedness.  Id.

40.     Whitney Ireland Leasing and Mexicana agreed under the 3790 Amendment #3 that none of the defaults under the 3790 Lease specified therein would be deemed to be an event of default, so long as Mexicana fulfilled its obligations under the 3790 Amendment #3.  Id. Whitney Ireland Leasing and Mexicana expressly agreed in the 3790 Amendment #3 that, notwithstanding the 3790 Amendment #3, all of Whitney Ireland Leasing's rights and remedies under the 3790 Lease were reserved.  Id.

41.     On April 26, 2010, Whitney Ireland Leasing and Mexicana entered into an amendment of the 3790 Amendment #3 ("Final 3790 Amendment").  Hermosillo Aff., ¶ 37; Ex. R.  The Final 3790 Amendment modified Mexicana's acknowledgment of defaults, in the 3790 Amendment #3, in making payments under the 3790 Lease, and modified the indebtedness of the 3790 Lease, as of April 26, 2010, to be US$1,382,961.11.  Id.  The Final 3790 Amendment modified the amortization schedule for Mexicana to pay down the total indebtedness under the

---

[2]     Amendment #1 was dated January 15, 2009 and merely added the manufacturer's serial number of the 3790 Aircraft to the 3790 Lease.

3790 Amendment #3, but otherwise preserved Whitney Ireland Leasing's rights as described in the 3790 Amendment #3.  Id.

42.     Related to the 4275 Lease, ILFC sent Mexicana a Notice of Default and Termination of Lease on March 22, 2010 (the "4275 Termination Notice"), before it had delivered the Aircraft to Mexicana.  Hermosillo Aff., ¶ 38; Ex. S.  The 4275 Termination Notice cited Mexicana's failure to pay outstanding amounts related to the 2002 Leases and the 3123 Lease.  Id.  Consequently, ILFC exercised its right to terminate the 4275 Lease.  Id.

43.     Shortly thereafter, on April 1, 2010, ILFC and Mexicana entered into a ratification of lease agreement related to the 4275 Lease (the "4275 Ratification").  Hermosillo Aff., ¶ 39; Ex. T.  The 4275 Ratification confirmed and ratified terms of the 4275 Lease and agreed that it still had full force and effect.  Id.

44.     On May 28, 2010, ILFC assigned the 4275 Lease to Whitney Ireland Leasing. Hermosillo Aff., ¶ 40; Ex. U.

45.     Pursuant to the 4275 Lease, Whitney Ireland Leasing delivered the 4275 Aircraft to Mexicana on May 28, 2010.  Hermosillo Aff., ¶ 41.

46.     On July 23, 2010, Whitney Ireland Leasing sent Mexicana a notice of termination and payment demand (the "2008 Leases Termination Notice"), terminating Mexicana's rights under the 2008 Leases, demanding an immediate grounding of the 3790 Aircraft and the 4275 Aircraft, and demanding that Mexicana return the 3790 Aircraft and the 4275 Aircraft to Miami International Airport no later than 12:00 p.m. on July 26, 2010.  Wallraff Aff., ¶ 4; Ex. B.  The 2008 Leases Termination Notice also demanded payment in full of Mexicana's outstanding balances on those leases in the amount of US$1,277,842.91.  Id.; Critch Aff., ¶ 16, Ex. G.

47.     Mexicana has not returned the 3790 Aircraft or the 4275 Aircraft to Whitney Ireland Leasing, and Mexicana has indicated that it will not immediately return the 3790 Aircraft or the 4275 Aircraft to Whitney Ireland Leasing.  Moreover, Mexicana has not informed Whitney Ireland Leasing of the location of the 3790 Aircraft or the 4275 Aircraft, and Whitney

Ireland Leasing believes that Mexicana has not grounded the 3790 Aircraft or the 4275 Aircraft and continues to operate them. Wallraff Aff., ¶ 7; Hermosillo Aff., ¶ 42.

### iii)    The 2126 Aircraft

48.    Sierra owns an Airbus A319-100 aircraft, bearing manufacturer's serial number 2126 (the "2126 Aircraft"). Hermosillo Aff., ¶¶ 43-44; Ex. V.

49.    On or about May 9, 2003, ILFC and Mexicana entered into an Aircraft Lease Agreement (the "2126 Lease" and, together with the 2002 Leases, the 2008 Leases and the 3123 Lease, the "Leases"). Id. By the terms of the 2126 Lease, Mexicana agreed to lease the 2126 Aircraft from ILFC from the date of delivery for sixty months. Id.

50.    Pursuant to the 2126 Lease, ILFC delivered the 2126 Aircraft to Mexicana on March 2, 2004. Hermosillo Aff., ¶ 45.

51.    Pursuant to the 2126 Lease, among other obligations, Mexicana agreed:

a.    To pay base rent, monthly in advance, in the amount of US$XXX and hourly rent equal to US$XXX per flight hour, based on actual flight utilization, payable monthly in arrears (Article 5.3);

b.    To pay a non-refundable refurbishment fee of US$XXX per hour flight logged, payable monthly in arrears (Article 5.4);

c.    To pay default interest at the prime rate plus XXX percent (XXX%) on all late payments due under the lease from the date upon which such payment was due, until the date on which such payment was received by ILFC's bank, or if Mexicana misses three consecutive payments on the due dates under the 2126 Lease, interest at the prime rate plus XXX percent (XXX%) from the date upon which such payment was due, until the date on which such payment was received by ILFC's bank, all such interest to accrue on a day-to-day basis and be compounded monthly (Article 5.6)

d.    That on the occurrence and during the continuance of an event of a default under the 2126 Lease, ILFC may terminate the lease and require Mexicana, by notice, to immediately return the 2126 Aircraft to ILFC at a location it chooses (Article 24.3); and

e.     That the prevailing party in any legal action arising from the 2126 Lease shall be entitled to recover reasonable attorneys' fees and other costs incurred in such action, plus pre- and post-judgment interest (Article 24.5).  Hermosillo Aff., ¶ 46; Ex. V.

52.     Additionally, an integral component of the 2126 Lease is a requirement (in Article 22.9 of this lease) that Mexicana pay at the return of the aircraft a cash reimbursement for all or a portion of the cost of the unperformed maintenance attributable to Mexicana's use of the aircraft, as follows (collectively, the "2126 Lease Top-Ups," and together with the 2002 Leases Top-Ups, the "Top-Ups"):

a.     an amount equal to (i) fifty percent (50%), multiplied by (ii) the product of the number of calendar days consumed on the Aircraft at return since the last "4C/5Y" check multiplied by a "4C/5Y" check cost per day calculated as follows: such "4C/5Y" check price per day will be the quotient obtained by dividing (a) the expected cost of the next "4C/5Y" check by (b) the full allotment of days between "4C/5Y" checks on the Aircraft as approved by the MPD;

b.     an amount equal to (i) the number of hours consumed on each Engine at return since the last full performance restoration shop visit multiplied by (ii) the full performance restoration shop visit cost per hour as provided by the Engine manufacturer's then-current, published cost per hour for such shop visits;

c.     an amount equal to the product of (a) the quotient obtained by dividing (i) the cycles consumed on each life-limited Part within an Engine by (ii) the total life of each such life-limited Part (according to the Engine manufacturer's published data) multiplied by (b) the replacement cost of the applicable life-limited Part;

d.     an amount equal to (i) forty percent (40%), multiplied by (ii) the product of the number of hours/cycles/days (whichever is the more limiting factor) consumed on each Landing Gear since the last Overhaul multiplied by a Landing Gear Overhaul cost per hour/cycle/day calculated as follows: such Landing Gear Overhaul cost price per hour/cycle/day will be the quotient obtained by dividing (a) the expected cost of the next Landing Gear

Overhaul by (b) the full allotment of hours/cycles/days between scheduled Overhauls for such Landing Gear as approved by the MPD.

53.     On May 24, 2005, ILFC assigned the 2126 Lease to Calliope Limited, one of its subsidiaries.  Hermosillo Aff., ¶ 47; Ex. W.

54.     On February 7, 2008, Calliope Limited and Mexicana entered into an amendment to extend the 2126 Lease period from March 1, 2009 to February 1, 2014, which was the first amendment to the 2126 Lease and increased the rent to US$XXX per month and refurbishment fee to US$XXX per hour flight logged.  Hermosillo Aff., ¶ 48; Ex. X.

55.     On April 7, 2010, Calliope Limited and Mexicana entered into an amendment of the 2126 Lease ("2126 Amendment #2").  Hermosillo Aff., ¶ 49; Ex. Y.  The 2126 Amendment #2 acknowledges Mexicana's events of default under the 2126 Lease in the amount of US$570,732.45.  Id.  The 2126 Amendment #2 sets an amortization schedule for Mexicana to pay down the total indebtedness, and institutes an interest rate of ten percent per annum on outstanding indebtedness.  Id.

56.     Calliope Limited and Mexicana agreed, in terms nearly identical to the 3790 Amendment #3, that none of the defaults under the 2126 Lease specified therein would be deemed to be an event of default, so long as Mexicana fulfilled its obligations under the 2126 Amendment #2.  Id.  Calliope Limited and Mexicana expressly agreed in the 2126 Amendment #2 that, notwithstanding the 2126 Amendment #2, all of Calliope Limited's rights and remedies under the 2126 Lease were reserved.  Id.

57.     On April 26, 2010, Calliope Limited and Mexicana entered into an amendment of the 2126 Amendment #2 ("Final 2126 Amendment").  Hermosillo Aff., ¶ 51; Ex. Z.  The Final 2126 Amendment modified Mexicana's acknowledgment of defaults, in the 2126 Amendment #2, in making payments under the 2126 Lease, and modified the indebtedness of the 2126 Lease, as of April 26, 2010, to be US$852,996.11.  Id.  The Final 2126 Amendment modified the amortization schedule for Mexicana to pay down the total indebtedness under the 2126

Amendment #2, but otherwise preserved Calliope Limited's rights as described in the 2126 Amendment #2. Id.

58.     On July 23, 2010, Calliope Limited sent Mexicana a notice of termination and payment demand (the "2126 Lease Termination Notice" and, together with the 3123 Lease and 2002 Leases Termination Notice and the 2008 Leases Termination Notice, the "Notices of Termination"), terminating Mexicana's rights under the 2126 Lease, demanding an immediate grounding of the 2126 Aircraft, and demanding that Mexicana return the 2126 Aircraft to Miami International Airport no later than 12:00 p.m. on July 26, 2010. Wallraff Aff., ¶ 4; Ex. C. The 2126 Lease Termination Notice also demanded payment in full of Mexicana's outstanding balances on the 2126 Lease in the amount of US$384,144.41. Id.; Critch Aff., ¶ 16, Ex. G.

59.     Mexicana has not returned the 2126 Aircraft to Calliope Limited, and Mexicana has indicated that it will not immediately return the 2126 Aircraft to Calliope Limited. Moreover, Mexicana has not informed Calliope Limited of the location of the 2126 Aircraft, and Calliope Limited believes that Mexicana has not grounded the 2126 Aircraft and continues to operate it. Wallraff Aff., ¶ 7; Hermosillo Aff., ¶ 52.

### iv)     Maintenance Reserves

60.     An integral component of the 3790 Lease, the 4275 Lease and the 3123 Lease is a requirement that Mexicana pay, in addition to a security deposit, a transaction fee and rent, certain supplemental amounts (based on Mexicana's use of the 3790 Aircraft, 4275 Aircraft and the 3123 Aircraft) on a monthly basis in the following sums in order to ensure proper maintenance of these aircraft (collectively, the "Reserves"):

      a.      6-Year Airframe Reserves[3]: US$XXX per calendar month

      b.      12-Year Airframe Reserves: US$XXX per calendar month

      c.      Engine Performance Restoration Reserves: US$XXX per engine flight hour for each engine (payable when the Engine is utilized on the Aircraft or another aircraft)

---

[3]     Terms utilized in this paragraph, but not defined in this paragraph, shall have the meanings ascribed thereto in the 3790 Lease, the 4275 Lease and the 3123 Lease.

          d.        Engine LLP Reserves: US$XXX per Engine cycle for each Engine (payable when the Engine is utilized on the Aircraft or another aircraft)

          e.        Landing Gear Reserves: US$XXX per calendar month

          f.        APU Reserves: US$XXX per APU hour (payable when the APU is utilized on the Aircraft or another aircraft)

          g.        Engine Thrust Reverser Reserves: US$XXX per Engine cycle for each Engine Thrust Reverser (each comprising two halves).[4]

Hermosillo Aff., ¶ 53.

61.      The payment of the Reserves and the Top-Ups is a critical component to the Leases. Hermosillo Aff., ¶ 56. Aircraft require routine maintenance after a certain amount of time or usage, which maintenance is time consuming and extremely costly. Id. In order to ensure that ILFC has sufficient funds on hand to pay for the high costs associated with these maintenance checks, ILFC often requires its lessees, like Mexicana, to make monthly payments in the form of the Reserves. Id. When costs are incurred in connection with the maintenance of a particular aircraft, ILFC reimburses the lessee from the Reserves for the costs associated therewith. Id. At the return of the aircraft from the lessee to ILFC, ILFC retains unreimbursed Reserves to cover the cost of maintenance attributable to the lessee's use of the aircraft. Id. When ILFC does not require its lessees to pay Reserves, it typically requires them to pay Top-Ups at return of the aircraft to cover the cost of maintenance attributable to the lessee's use of the aircraft. Id.

62.      In the case of the 3790 Lease, the 4275 Lease and the 3123 Lease, Mexicana is required to make monthly payments of the Reserves pursuant to Section 5.4 of the 3790 Lease, the 4275 Lease and the 3123 Lease. Hermosillo Aff., ¶ 57. Mexicana, however, has failed to make payments of the Reserves for these leases. Id. Mexicana has not made any attempts to pay these outstanding amounts to ILFC or Whitney Ireland Leasing (as applicable) or indicated when

---

[4]      The requirement that the Reserves be paid is located in Section 5.4 of the 3790 Lease, the 3123 Lease and the 4275 Lease.

it might bring the amounts due and owing current.  Id.  In addition, it is extremely unlikely that Mexicana will pay the Top-Ups at the return of the 1866 Aircraft, the 1872 Aircraft, the 1882 Aircraft, the 1925 Aircraft and the 2126 Aircraft.  Id.  As a result, ILFC, Whitney Ireland Leasing, or Calliope Limited (as applicable) will be forced to pay out of its own pocket for the portion of the cost of maintenance attributable to Mexicana's use of the Aircraft for which Mexicana has not paid Reserves or Top-Ups.  Id.

## JURISDICTION AND VENUE

63.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(P).  Venue is proper before this Court pursuant to 28 U.S.C. § 1410.

## RELIEF REQUESTED

64.     By this Motion and pursuant to section 105(a) of the Bankruptcy Code, the ILFC Group seeks entry of an order (a) granting the ILFC Group relief from the TRO, (b) finding that any preliminary injunction that may be issued by this Court shall not apply to the ILFC Group and its Aircraft, (c) declaring that the Leases are terminated and (d) declaring, in the instance that an order is entered recognizing the Concurso Proceeding as a "foreign main proceeding", that the automatic stay does not apply to the ILFC Group and the Aircraft.

## BASIS FOR RELIEF

65.     The relief requested by this Motion is appropriate under the Court's equitable powers under section 105(a) of the Bankruptcy Code, which provides that the "court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).

**C.      The ILFC Group Should be Granted Relief from the TRO Because the Requisite Factors for the Issuance of a TRO are Not Met as to the ILFC Group and the Aircraft**

66.     Section 1519(a) of the Bankruptcy Code provides that interim provisional relief is available upon the request of the foreign representative where such relief is "urgently needed to

protect the assets of the debtor or the interests of creditors," during the period between the filing of a Chapter 15 petition and the hearing on recognition. 11 U.S.C. § 1519(a) (emphasis added). Section 1519(a) further provides that such interim provisional relief may include "staying execution against the debtor's assets." 11 U.S.C. § 1519(a)(1) (emphasis added). In order to obtain such interim relief (in the form of a temporary restraining order), Rule 65 of the Federal Rules of Civil Procedure, made applicable by Federal Rule of Bankruptcy Procedure 7065, requires the movant to (i) show that "immediate and irreparable injury, loss or damage" will befall it before the adverse party may be notified; and (ii) set forth any efforts taken to give notice to the adverse party and why notice should not be required. FED R. CIV. P. 65(b)(1). "[I]t has always been true that irreparable injury means injury for which a monetary award cannot be adequate compensation and that where money damages is adequate compensation a preliminary injunction will not issue." Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc., 596 F.2d 70, 72 (2d Cir. 1979).

67.     The standard for issuance of a temporary restraining order is essentially the same as for a preliminary injunction. See, e.g., Absolute Recovery Hedge Fund, L.P. v. Gaylord Container Corp., 185 F. Supp. 2d 381, 385 (S.D.N.Y. 2002) (parties agreeing that proper standard for evaluating TRO is the injunction standard).

> **v)     Mexicana Has No Legal Interest in the Aircraft and Thus Cannot Demonstrate, Under Any Construction of the Facts, Irreparable Harm**

68.     Section 541 of the Bankruptcy Code vests the bankruptcy estate with the debtor's legal and equitable interests in property as of the filing of the petition. 11 U.S.C. § 541.[5] The nature and extent of such property interests is determined by state law. Butner v. United States, 440 U.S. 48, 54 (1979) (determining that property interests are created and defined by state law

---

[5]     We are aware that section 541 of the Bankruptcy Code, which defines what property comprises a debtor's bankruptcy estate, is not applicable to proceedings pending under Chapter 15 of the Bankruptcy Code. Nonetheless, we reference section 541 because, as discussed below, courts have held that terminated leases are not property of a debtor's bankruptcy estate. Infra, ¶¶ 74-75. This Court should rely on this principle here, among others (as discussed below), to find that Mexicana has no interest in the Leases, and thus, the Aircraft.

"unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding"); see also In re Issa Corp., 142 B.R. 75, 77 (Bankr. S.D.N.Y. 1992). The Leases contain a choice of law provision electing the application of California law. Leases, Article 26.

69. Under California law, Mexicana defaulted under the terms of the Leases resulting in the termination of the Leases prior to the commencement of the bankruptcy proceedings. According to the plain terms of the Leases, on the occurrence and during the continuance of an event of default under a Lease, the ILFC Group may terminate the Lease and require Mexicana, by notice, to return the Aircraft pertaining to that Lease to the ILFC Group at a location it chooses. Lease, Article 25.3.

70. As stated above, Mexicana failed to pay rent and satisfy its obligations under the 2002 Leases and the 3123 Lease. As a result, on November 9, 2009, ILFC and Mexicana entered into an amendment of the 2002 Leases and the 3123 Lease. Global Amendment #1, among other things, acknowledged Mexicana's defaults and set an amortization schedule for Mexicana to pay down its total indebtedness under these leases. ILFC and Mexicana expressly agreed in Global Amendment #1 that, notwithstanding Global Amendment #1, all of ILFC's rights and remedies under these leases were reserved. On April 26, 2010, ILFC and Mexicana entered into Global Amendment #2, which, among other things, modified Mexicana's acknowledgment of the defaults in Global Amendment #1 and modified the indebtedness under the 3123 Lease and the 2002 Leases. Mexicana, however, failed to make the payments to which it agreed in Global Amendment #2, resulting in a default under the 3123 Lease and the 2002 Leases. Hermosillo Aff., ¶¶ 24-25. Meanwhile, Mexicana also defaulted on the 2008 Leases and the 2126 Lease. Hermosillo Aff., ¶¶ 42; 52.

71. In accordance with the terms of the 2002 Leases and the 3123 Lease, on June 23, 2010, Joseph H. Hermosillo, Senior Vice President of ILFC, signed the Notice of Default. Hermosillo Aff., ¶ 25; Wallraff Aff., ¶¶4-5. The Notice of Default was delivered to Mexicana's offices on June 24, 2010. Hermosillo Aff., ¶ 25. The Notice of Default cited Mexicana's failure

to make payments of monthly rent, refurbishment fees, default interest, and other obligations under the 2002 Leases and the 3123 Lease, as well as under Global Amendment #1 as modified by Global Amendment #2.  Id.  The Notice of Default demanded that Mexicana satisfy, within five (5) business days, its delinquencies under the obligations specified therein.  Hermosillo Aff., ¶ 26.  Mexicana failed to cure its defaults as outlined in the Notice of Default within five (5) business days.  Hermosillo Aff., ¶¶ 26-27.

72.     On July 23, 2010, the ILFC Group delivered the Notices of Termination to Mexicana terminating Mexicana's rights under all of the Leases, requiring payment in full of all amounts outstanding under the Leases, demanding an immediate grounding of each Aircraft, and demanding that Mexicana return the Aircraft to Miami International Airport no later than 12:00 p.m. on July 26, 2010.  Wallraff Aff., ¶¶ 4-6.  Such Notices of Termination comport with the requirements of each of the Leases to terminate the Leases.  Leases, Article 24.3.

73.     Under the California Commercial Code, which is based on Article 2A of the Uniform Commercial Code, "[w]hether the lessor or the lessee is in default under a lease contract is determined by the lease agreement and this division."  Cal. Comm. C. § 10501(a).  Events of default by a lessee include the failure to make a payment due under the lease agreement.  Id. at § 10523(a).  Remedies for default are provided for in the California Commercial Code and under the lease, except as limited by the California Commercial Code.  Id. at § 10501(b).  In addition to a contractual right to terminate a lease and the right to repossess the property that is the subject of the lease, California law provides that a lessor may cancel a lease upon the occurrence of an event of default or retake possession of the property.  Id. at § 10523(a).  Cancellation occurs when a party ends the lease contract for default by the other party.  Id. at § 10103(a)(2).  "On cancellation of the lease contract, all obligations that are still executory on both sides are discharged, but any right based on prior default or performance survives, and the canceling party also retains any remedy for default of the whole lease contract or any unperformed balance."  Id. at § 10505(a).

74.     Here, upon the delivery of the Notices of Termination to Mexicana, ILFC canceled the Leases both by the terms of the Leases and under California law.   Pursuant to the California Commercial Code, such cancellation terminated all of Mexicana's legal and equitable rights under the Leases prepetition.  See id.

75.     Moreover, the cancellation of the Leases prepetition terminated Mexicana's rights and interests thereunder pursuant to the Bankruptcy Code.  It is axiomatic that the filing of a bankruptcy petition does not expand the debtor's rights any greater than such rights existed at the commencement of the bankruptcy case.  In re M.J. & K Co., Inc., 161 B.R. 586, 593 (Bankr. S.D.N.Y. 1993); Moody v. Amoco Oil Co., 734 F.2d 1200, 1213 (7th Cir. 1984).  Thus, "'[w]hen a debtor's legal and equitable interests in property are terminated prior to the filing of the petition with the Bankruptcy Court that was intended to preserve the debtor's interest in such property, **the Bankruptcy Court cannot then cultivate rights where none can grow**.'"  In re Island Helicopters, Inc., 211 B.R. 453, 455 (Bankr. E.D.N.Y. 1997) (emphasis in original) (quoting In re Butchman, 4 B.R. 379, 381 (Bankr. S.D.N.Y. 1980) (finding that debtor's right terminated in property when property was sold in foreclosure sale prior to the commencement of the bankruptcy action)); In re Rodgers, 333 F.3d 64, 69 (2d Cir. 2003) ("Because [the debtor] lost her legal and equitable interests in the property by virtue of the foreclosure sale, the property did not become property of the estate when the bankruptcy petition was filed."); In re Bronx-Westchester Mack Corp., 4 B.R. 730, 731 (Bankr. S.D.N.Y. 1980) (concluding that if the distributorship agreement was effectively terminated prepetition, the filing of a bankruptcy petition cannot resurrect the agreement).

76.     This Court applied similar logic in its In re Hudson Transfer Group, Inc. decision. 245 B.R. 456 (Bankr. S.D.N.Y.).  While the facts of Hudson Transfer differ, the legal principles are the same.  In Hudson Transfer, prepetition, the landlord issued a warrant of eviction, which resulted in the cancellation of the lease and the annulment of the landlord/tenant relationship.  Id. at 458.  This Court concluded that "[a] bankruptcy petition does not revive a terminated lease." Id.; see also In re Darwin, 22 B.R. 259 (Bankr. N.D.N.Y. 1982) ("[I]f . . . there is no lease, there

is nothing to assume and 11 U.S.C. § 365 cannot be utilized by the debtors since it is inapplicable."); Matter of Triangle Laboratories, Inc., 663 F.2d 463, 467-8 (3d Cir. 1981) (finding that a "bankruptcy court cannot resurrect a lease terminated prior to the filing of the petition."); In re Seven Hills, Inc., 403 B.R. 327, 334 (Bankr. D.N.J. 2009) ("In cases where the underlying contract or lease has been validly terminated prior to the institution of the bankruptcy proceedings, [such contract or lease] is not resurrected by the filing of the petition in bankruptcy and cannot therefore be included among the [debtor in possession's] assets." (citing In re Robertson, 147 B.R. 358, 361 (Bankr. D. N.J. 1992)).

77.     It is clear from the aforementioned cases that this Court cannot resurrect the Leases, as they were terminated prior to the commencement of Mexicana's bankruptcy case. Thus, the Leases are not property of Mexicana's bankruptcy estate, have never been property of the estate and never will be.  Based thereon, ILFC is entitled to relief from the TRO so that it may exercise whatever legal rights it may possess under state law to seek recovery of the Aircraft.

**D.      A Preliminary Injunction Should Not Be Entered as to the ILFC Group and the Aircraft Because Mexicana Has Failed to Satisfy the Preliminary Injunction Factors**

78.     Section 1519(e) of the Bankruptcy Code provides that "the standards, procedures, and limitations applicable to an injunction shall apply to relief under [section 1519]."  11 U.S.C. § 1519(e).  This is a departure from the pre-BAPCPA Code which created some confusion as to whether it was necessary to show irreparable harm for an injunction in the context of a foreign proceeding.  Compare In re Singer, 205 B.R. 355, 356 (S.D.N.Y. 1997) (no showing of irreparable harm required under pre-BAPCPA Code); with Wilson v. Creditors' Comm. of Commodore Int'l Ltd. (In re Commodore Bus. Machs.), 246 B.R. 476, 486 (S.D.N.Y. 2000) (contra).

79.     In In re MMG LLC, 256 B.R. 544 (Bankr. S.D.N.Y 2000) (Bernstein, J.), the court considered the request for preliminary injunction by a representative of a foreign debtor. Although the relief was sought under the pre-BAPCPA Code's section 304, which provided

specific guidelines for when an injunction should issue, the court declined to grant relief under that section. Instead, it analyzed the issue under "traditional standards for preliminary injunctive relief." Id. at 552.

80.     Those traditional standards for a preliminary injunction require the movant to "show irreparable harm and either (a) a likelihood of success on the merits; or (b) a sufficiently serious question going to the merits to make it a fair ground for litigation, and the balance of hardships tipping decidedly in the movant's favor." Id. at 550-51 (citing Tucker Anthony Realty Corp. v. Schlesinger, 888 F.2d 969, 972 (2d Cir. 1989); Green v. Drexler (In re Feit & Drexler), 760 F.2d 406, 415 (2d Cir. 1985)) (emphasis added). Irreparable harm in the bankruptcy context "exists whenever local creditors or the foreign debtor seek to collect their claims or obtain preferred positions to the detriment of the other creditors." In re MMG LLC, 256 B.R. at 555. Ultimately, a movant must adduce reasonable evidence of harm to justify the grant of a preliminary injunction. See USA Network v. Jones Intercable, Inc., 704 F.Supp 488, 491 (S.D.N.Y. 1989) (A preliminary injunction "should issue not upon a plaintiff's imaginative, worst case scenario of the consequences flowing from the defendant's alleged wrong but upon a concrete showing of imminent irreparable injury.").

81.     Here, because Mexicana cannot meet the irreparable harm requirement as thoroughly set forth above, Mexicana is not entitled to the entry of a preliminary injunction as to the ILFC Group and the Aircraft. As such, to the extent a preliminary injunction is issued in this case, the preliminary injunction should expressly provide that it is not applicable to the ILFC Group and the Aircraft.

**E.      If, and When, an Order Is Entered Recognizing the Concurso Proceeding as a "Foreign Main Proceeding," the Automatic Stay Does Not Apply to the ILFC Group and the Aircraft**

82.     Pursuant to section 1521(a) of the Bankruptcy Code, "[u]pon recognition of a foreign proceeding that is a foreign main proceeding – (1) sections 361 and 362 apply with respect to the debtor and the property of the debtor that is within the territorial jurisdiction of the

United States." 11 U.S.C. § 1520(a)(1). To the extent this Court enters an order in which it recognizes the Concurso Proceeding as a "foreign main proceeding" within the meaning of Chapter 15 of the Bankruptcy Code, the ILFC Group asserts that, for the reasons stated herein, the order should expressly provide that the automatic stay of section 362 of the Bankruptcy Code does not apply to the ILFC Group and the Aircraft.

## NOTICE

83.     Notice of this Motion has been provided to (i) the Office of the United States Trustee for the Southern District of New York, (ii) Mexicana, and (iii) all parties required to be given notice under Bankruptcy Rule 2002(q)(1) of which the ILFC Group is currently aware. The ILFC Group submits that no other or further notice need be provided.

## NO PRIOR REQUEST

84.     No previous request for the relief requested herein has been made to this or any other court.

WHEREFORE, for the reasons set forth herein, the ILFC Group respectfully requests that this Court enter an order, substantially in the form attached hereto as Exhibit A, (i) granting the relief requested herein and (ii) granting the ILFC Group such other and further relief as the Court deems proper and just.

Dated: New York, New York
       August 9, 2010

Respectfully submitted,

WHITE & CASE LLP

By /s/ Scott Greissman_____
      Scott Greissman, Esq.

1155 Avenue of the Americas
New York, New York 10036-2787
Telephone: (212) 819 8200
Facsimile: (212) 354-8113

Roberto J. Kampfner (CBN 179026)
Melanie C. Scott (CBN 234646)
633 West Fifth Street, Suite 1900
Los Angeles, CA 90071-2007
Telephone:  (213) 620-7700
Facsimile:   (213) 452-2329

*Attorneys for International Lease Finance*
*Corporation and related entities*

LOSANGELES 874837 (2K)

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | ) Chapter 15 |
| | ) |
| COMPANIA MEXICANA DE AVIACION, S.A. | ) Case No. 10-14182 (MG) |
| de C.V., | ) |
| | ) |
| Debtor in a Foreign Proceeding. | ) |
| | ) |
| | ) |

## <u>ORDER TO SHOW CAUSE</u>

This matter having come before this Court by the motion (the "Motion") of International

Lease Finance Corporation, Whitney Ireland Leasing Limited and Calliope Limited (collectively,

"ILFC"), for an Order requiring Compañía Mexicana de Aviación, S.A. de C.V. ("Mexicana") to

show cause why an order granting relief from the Second Amended Order to Show Cause with

Temporary Restraining Order entered by this Court on August 5, 2010 (the "TRO") should not

be entered for the reasons set forth in the Motion, and the Court having considered the Motion,

the Affidavit of Joseph H. Hermosillo, the Affidavit of Chris Wallraff and the Affidavit of

Elizabeth Critch and the exhibits attached thereto, and for good cause shown, it is hereby

ORDERED that Mexicana is to show cause before this Court, at Room 523, United States

Bankruptcy Court, One Bowling Green, New York, New York, 10004-1408, on the _____ day of

August 2010, at __:__ __.m., or as soon thereafter as counsel may be heard, why an Order should

not be entered pursuant to the Motion granting relief from the TRO and the prohibitions and

injunctions set forth therein to permit ILFC to take certain actions to take possession of the

Aircraft as that term is defined in the Motion; and it is further

ORDERED, that service of a copy of this Order, the Motion and the related Affidavits

and exhibits thereto shall be made upon counsel for Maru E. Johnson, in her capacity as the

alleged "Foreign Representative" for Mexicana, Duane Morris LLP, 1540 Broadway, New York,

NY 10036-4086, Attention: William C. Heuer, Esq. and Meyer, Suozzi, English and Klein, P.C.,

1350 Broadway, Suite 501, New York, New York 10018, Attention: Edward J. LoBello, Esq., by personal service or delivery to a recognized courier service on or before August ___, 2010 at __:__ __.m., which service shall be deemed good and sufficient service thereof; and it is further

ORDERED, that to the extent Mexicana desires to respond to the Motion, such response must be received on or before August ___, 2010 at __:__ __.m., by electronic mail, rkampfner@whitecase.com and facsimile, (213) 452-2329, to White & Case LLP, 633 West Fifth Street, Suite 1900, Los Angeles, CA, 90071-2007, Attention: Roberto J. Kampfner, Esq.; and it is further

ORDERED that reply papers, if any, shall be served on or before August ___, 2010 at __:__ __.m., by service on counsel for Maru E. Johnson, in her capacity as the alleged "Foreign Representative" for Mexicana, as state above.

Dated: New York, New York
      August __, 2010

                            _____
                            UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT A

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | ) Chapter 15 |
| | ) |
| COMPANIA MEXICANA DE AVIACION, S.A. de C.V., | ) Case No. 10-14182 (MG) |
| | ) |
| Debtor in a Foreign Proceeding. | ) |
| | ) |

**ORDER GRANTING RELIEF FROM TEMPORARY RESTRAINING ORDER, DETERMINING THAT CERTAIN LEASE AGREEMENTS ARE TERMINATED, DETERMINING THAT THE AUTOMATIC STAY IS NOT APPLICABLE IF AN ORDER IS ENTERED RECOGNIZING THE CONCURSO PROCEEDING AS A FOREIGN MAIN PROCEEDING AND SUSTAINING OBJECTION TO THE IMPOSITION OF A PRELIMINARY INJUNCTION**

THIS MATTER having come before the Court upon the (a) emergency Motion dated August 6, 2010 of International Lease Finance Corporation, Whitney Ireland Leasing Limited and Calliope Limited (collectively, the "ILFC Group"), for entry of an order (i) granting relief from the Second Amended Order to Show Cause with Temporary Restraining Order entered by this Court on August 5, 2010 in the above-captioned case (the "TRO") pursuant to paragraphs 12 and 16 of the TRO, (ii) declaring that the Leases are terminated and (iii) declaring that to the extent this Court enters an order recognizing the Concurso Proceeding as a "foreign main proceeding", the automatic stay is inapplicable to the ILFC Group and its aircraft and (b) objection to the imposition of a preliminary injunction (collectively, the "Motion"),[6] and it appearing that this Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334; and it appearing that venue of this chapter 11 case and the Motion in this district is proper pursuant to 28 U.S.C. § 1410; and it appearing that this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(P); and this Court having determined that the relief requested

---

[6]      Terms utilized herein, but not defined herein, shall have the meanings ascribed thereto in the Motion.

in the Motion is in the best interests of Mexicana, its estate, its creditors and other parties in interest; and it appearing that proper and adequate notice of the Motion has been given and that no other or further notice is necessary; and upon the record at the hearing on the Motion; and after due deliberation thereon; and good and sufficient cause appearing therefor, it is hereby

ORDERED that the Leases terminated prior to the date upon which the Petition was filed under Chapter 15 of the Bankruptcy Code and, as such, Mexicana has no legal and/or equitable right and/or interest under, in or relating to the Leases; and it is further

ORDERED that neither the TRO nor any prohibition set forth therein shall apply to any of the Aircraft or Leases or any attempts of the ILFC Group to take possession of any of the Aircraft, Airframes, Engines, Parts and Aircraft Documentation identified on Exhibit 1 to this Order, within the United States, including through litigation commenced within the United States; and it is further

ORDERED that to the extent a preliminary injunction is issued in this case, the preliminary injunction shall contain an express provision providing that the preliminary injunction does enjoin, in any fashion, the ILFC Group's right to take possession of any of the Aircraft, Airframes, Engines, Parts and Aircraft Documentation identified on Exhibit 1 to this Order, within the United States, including through litigation commenced within the United States; and it is further

ORDERED that to the extent this Court enters an order in which it recognizes the Concurso Proceeding as a "foreign main proceeding" within the meaning of Chapter 15 of the Bankruptcy Code, the order shall expressly provide that the automatic stay of section 362 of the Bankruptcy Code does not apply to the ILFC Group, any of the Aircraft, Airframes, Engines, Parts and Aircraft Documentation identified on Exhibit 1 to this Order and any efforts by the ILFC Group to take possession thereof; and it is further

ORDERED that nothing in this Order shall be construed as authorizing the ILFC Group to commence or undergo any action within Mexico to take possession of any of the Aircraft,

Airframes, Engines, Parts, and Aircraft Documentation identified on Exhibit 1 to this Order; and it is further

ORDERED that Mexicana, the Foreign Representative and the ILFC Group are authorized to take all actions necessary to effectuate this Order.

Dated: New York, New York
      August ___, 2010

_____
UNITED STATES BANKRUPTCY JUDGE

## **EXHIBIT 1**

(i)      one Airbus A319-100 aircraft, bearing manufacturer's serial number 1866, which includes its respective Airframe, Engines, Parts, and Aircraft Documentation (as those terms are defined in the governing lease) (the "1866 Aircraft");

(ii)      one Airbus A319-100 aircraft, bearing manufacturer's serial number 1872, which includes its respective Airframe, Engines, Parts, and Aircraft Documentation (as those terms are defined in the governing lease) (the "1872 Aircraft");

(iii)      one Airbus A319-100 aircraft, bearing manufacturer's serial number 1882, which includes its respective Airframe, Engines, Parts, and Aircraft Documentation (as those terms are defined in the governing lease) (the "1882 Aircraft");

(iv)      one Airbus A319-100 aircraft, bearing manufacturer's serial number 1925, which includes its respective Airframe, Engines, Parts, and Aircraft Documentation (as those terms are defined in the governing lease) (the "1925 Aircraft");

(v)      one Airbus A320-200 aircraft, bearing manufacturer's serial number 3123, which includes its respective Airframe, Engines, Parts, and Aircraft Documentation (as those terms are defined in the governing lease) (the "3123 Aircraft");

(vi)      one Airbus A319-100 aircraft, bearing manufacturer's serial number 3790, which includes its respective Airframe, Engines, Parts, and Aircraft Documentation (as those terms are defined in the governing lease) (the "3790 Aircraft");

(vii)      one Airbus A319-100 aircraft, bearing manufacturer's serial number 4275, which includes its respective Airframe, Engines, Parts, and Aircraft Documentation (as those terms are defined in the governing lease) (the "4275 Aircraft"); and

(viii)      one Airbus A319-100 aircraft, bearing manufacturer's serial number 2126, which includes its respective Airframe, Engines, Parts, and Aircraft Documentation (as those terms are defined in the governing lease) (the "2126 Aircraft").