Martin N. Flics
Paul S. Hessler
LINKLATERS LLP
1345 Avenue of the Americas
New York, NY 10105
(+1) 212 903 9000 (Tel)
(+1) 212 903 9100 (Fax)

*Attorneys for Banco
Mercantil del Norte, S.A.*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------x

*In re*

COMPANIA MEXICANA DE AVIACION, S.A. de
C.V.,

　　　　　Debtor in a Foreign Proceeding.

------------------------------------------------x

Chapter 15

Case No. 10-14182 (MG)

### BANCO MERCANTIL DEL NORTE, S.A.'S (I) OBJECTION TO FOREIGN REPRESENTATIVE'S APPLICATION FOR ORDER (A) GRANTING PROVISIONAL RELIEF AND INJUNCTION AND (B) SCHEDULING HEARING AND (II) DEMAND FOR PROTECTION UNDER 11 U.S.C. §§ 1519, 1522, 361, 362 AND 363[1]

Pursuant to sections 1519, 1522, 361, 362, 363 and 105 of title 11 of the United

States Code (the "**Bankruptcy Code**"), Banco Mercantil del Norte S.A. ("**Banorte**"), by and

through its undersigned counsel, hereby (I) objects to the Foreign Representative's Ex Parte

Application for Order (A) Granting Provisional Relief and Injunction and (B) Scheduling

Hearing, and (II) demands protection, and in support thereof states as follows:

---

[1] The objection deadline was extended by agreement while Mexicana and Banorte engaged in substantial discussions regarding the language of the proposed preliminary injunction order. Although those discussions resulted in an understanding between the parties on Sunday afternoon, Mexicana subsequently sought additional modifications which were not acceptable to Banorte and necessitated the filing of this objection.

A12372127

## PRELIMINARY STATEMENT

1.     Banorte is the primary lender to Compania Mexicana de Aviacion, S.A. de D.V.

("**Mexicana**" or the "**Debtor**") and its affiliates under a credit agreement dated April 17, 2008

(the "**Credit Agreement**") (**Exhibit A**) pursuant to which Mexicana and its co-obligors have

approximately $1,572,420,000.00 (Mexican Pesos) (or approximately $123.6 million (USD)) of

indebtedness to Banorte. Mexicana's obligations to Banorte are secured in the United States by,

among other things, two deposit accounts pledged in favor of Inter National Bank ("**INB**"), as

collateral agent for Banorte, and the proceeds thereof (the "**Collateral Accounts**"). The

Collateral Accounts serve as collection accounts into which cash generated from certain Visa,

MasterCard and American Express credit card receipts in relation to ticket sales must be

deposited.

2.     Notwithstanding Mexicana's various representations to this Court and to the

public that it intends to continue operating its business in the ordinary course, Mexicana

suspended all new ticket sales one day after the Bankruptcy Court entered its amended

emergency *ex parte* Temporary Restraining Order (the "**Amended TRO**"). *See* Press Release

04: CMA files for Chapter 15, http://cmainforma.com/press-releases/2010/8/3/press-release-04-

cma-files-for-chapter-15.html, August 3, 2010 (**Exhibit B**) ("Passengers will not be affected as

part of the proceedings, since CMA will continue to render services normally while it

restructures its liabilities and brings its costs into line with market conditions"); (Ex Parte App.

for Order (A) Granting Prov. Relief and Injunction and (B) Scheduling a Hearing (the

"**Application**") ¶ 21, Aug. 2, 2010) ("Even the mere threat of [creditor action] could undermine

the confidence of Mexicana's customers and suppliers, causing Mexicana considerable

distraction and loss of value as it moves forward with its restructuring . . . or worse, disrupting

Mexicana's flight operations."); (Amended TRO) (granting temporary restraining order on

August 3, 2010); Press Release 05: CMA suspends ticket sales, continues flying normally, http://cmainforma.com/press-releases/2010/8/4/press-release-05-cma-suspends-ticket-sales-continues-flying.html, August 4, 2010 (**Exhibit C**) ("[A]ll ticket sales will be suspended and . . . no tickets will be issued until further notice," but Mexicana "will continue to operate its international flights").

3. Further, press reports indicate that (1) Mexicana has suspended numerous international flights and (2) pilots and certain other employees of Mexicana have agreed to work for free for a short time while Mexicana continues its restructuring efforts. *See* Press Release 07: Mexicana Airlines to reduce flights, http://cmainforma.com/press-releases/2010/8/8/press-release-07-mexicana-airlines-to-reduce-flights.html, August 8, 2010 (**Exhibit D**) ("Mexicana Airlines will be forced to cancel certain flights over coming days to optimize available resources," and "[i]f you are planning on traveling by air in the immediate future, Mexicana Airlines suggests you consider alternatives, where possible."); *Mexicana needs at least $100 mln to keep flying-CEO*, Reuters, Aug. 10, 2010, http://www.reuters.com/assets/print?aid=USN1016500420100810 (**Exhibit E**) ("Mexicana pilots have not been getting paid since Sunday, their union said.").

4. Plainly, these are not the actions of an airline operating in the ordinary course of business.

5. With no new ticket sales to replenish cash used by Mexicana to fund its remaining operations, the injunctive relief sought by Mexicana has put Banorte in an untenable position. Any cash that Mexicana has withdrawn from Banorte's Collateral Accounts, and any failure to deposit cash, as required, in the Collateral Accounts, necessarily decreases the value of Banorte's collateral. Neither the Amended TRO nor the proposed form of Preliminary Injunction provides

Banorte with the adequate protection required by sections 362 and 363 for creditors whose claims are secured by cash collateral. In a customary chapter 11 case, this adequate protection would typically take the form of a grant of replacement liens and priority claims to compensate for any diminution in the value of the collateral resulting from the imposition of injunctive relief and the permission for the Debtor to use the collateral in the ordinary course of business. The injunctive relief sought by Mexicana would permit the Debtor to continue to use funds Banorte's cash collateral without any protections in favor of Banorte regarding its use.

6.      As any use by Mexicana of funds in the Collateral Accounts necessarily depletes Banorte's cash collateral, Banorte objects to the entry of any injunctive relief that does not adequately protect its security interest from further diminution in value. Additionally, absent an order imposing cash collateral controls, there is insufficient assurance that Mexicana will continue to deposit cash proceeds of operations in the Collateral Accounts as contemplated by its financing agreements.

7.      Consequently, Banorte requests an Order excluding Banorte from the operation of the Preliminary Injunction and ordering Mexicana to provide protection to Banorte in exchange for the right to use Cash Collateral, such protection including, but not limited to, orders that Mexicana:

- account for (a) the value of cash collateral held in Banorte's Collateral Accounts as of the petition date, (b) its use of any such funds during the pendency of its bankruptcy proceedings, and (c) the reasons for such use;

- ensure that its U.S. credit card receivables will continue to flow into its Collateral Accounts;

- not open any new accounts during the pendency of its bankruptcy proceeding which are not pledged in favor of Banorte;

- provide a budget of its expenditures that is agreeable in all respects to Banorte;

- use the cash in the Collateral Accounts only in accordance with the agreed budget;

- provide Banorte with replacement liens and superpriority administrative priority claims against Mexicana's estate as contemplated by sections 503(b) and 507(b) of the Bankruptcy Code to compensate it for any loss in value of its collateral, *nunc pro tunc* to the date of petition, to the fullest extent allowed by United States or Mexican bankruptcy law.

## BACKGROUND

8. On April 17, 2008, Banorte entered into the $1,572,420,000.00 (Mexican Pesos) Credit Agreement among Mexicana, Aero Caribe S.A. de C.V. and Grupo Mexicana de Aviacion S.A. de C.V., as guarantors, and Gamma Servicios de Negocios, S.A. de C.V. as borrower. The Credit Agreement is the primary financing vehicle on which Mexicana has relied. (Johansen Decl. Pursuant 28 U.S.C. § 1746, August 2, 2010 ("**Johansen Decl.**" or "**Johansen Declaration**") ¶ 14).

9. The obligations of Mexicana and its non-debtor affiliates under the Credit Agreement are supported by the proceeds of Mexicana's Mexican and U.S. ticket sales sold through American Express, Visa and MasterCard. In Mexico, the parties entered into a trust arrangement governed by Mexican law pursuant to which applicable proceeds of Mexican credit card ticket sales would flow into a Mexican trust collection account over which Banorte has rights as the primary beneficiary.

10. To achieve a similar result in the U.S. with respect to U.S.-based ticket sales, Banorte, Mexicana and Aerovias Caribe, S.A. de C.V. and INB, as collateral agent, entered into a Deposit Account Security Agreement dated as of June 16, 2008 (the "**Security Agreement**") (**Exhibit F**) pursuant to which Mexicana pledged, among other things, its interests in the Collateral Accounts to INB, as collateral agent for Banorte. As of the same date, Banorte and INB entered into a Collateral Agency Agreement (the "**Collateral Agency Agreement**")

(**Exhibit G**) pursuant to which Banorte appointed INB to act as collateral agent for and on behalf of Banorte under the Security Agreement. The Collateral Accounts are the collection accounts into which the proceeds of U.S. ticket sales flow, creating the value of the collateral.

11.     Banorte and Mexicana have had numerous discussions regarding Mexicana's financial condition during the months leading up to Mexicana's commencement of insolvency proceedings, including with respect to the possibility that Mexicana would seek bankruptcy protection. Mexicana regularly assured Banorte that any bankruptcy filing by Mexicana would not in any way implicate, affect or prejudice Banorte's rights under the Credit Agreements. Given this context, Banorte was surprised to learn that it was named among the parties against whom Mexicana sought relief in both Mexico and New York.

12.     On August 2, 2010 (the "**Petition Date**") Mexicana initiated a voluntary judicial reorganization proceeding (the "**Concurso Proceeding**") pursuant to provisions of the *Ley de Concusos Mercantiles* (the "**Mexican Business Reorganization Act**" or "**Concurso Law**") by submitting its voluntary petition to commence a case under the Mexican Business Reorganization Act to the District Court for Civil Matters for the Federal District, Mexico (the "**Mexico Court**").

13.     On the same date, Maru E. Johnson (the "**Foreign Representative**"), in her capacity as proposed foreign representative of Mexicana, filed a petition (the "**Petition**") in this Court under chapter 15 of the Bankruptcy Code for recognition of Mexicana's Concurso Proceeding pending in the Mexico Court as a "foreign main proceeding."

14.     The Foreign Representative also caused to be filed the Application. In the Application, among other things, the Foreign Representative sought: (a) the immediate entry, without a hearing, of an order to show cause with a temporary restraining order providing that

the automatic stay of section 362 of the Bankruptcy Code applies to this proceeding until this Court recognizes the Concurso Proceeding as a "foreign main proceeding;" and (b) after a hearing on ten days' notice, the issuance of a preliminary injunction (the "**Preliminary Injunction**") providing the same relief as that sought in the Amended TRO.

15.     By order entered on August 2, 2010, the Application was granted, which order was modified by the entry of the Amended TRO on August 3, 2010. Pursuant to the Amended TRO, "the protections of section 362 of the Bankruptcy Code appl[y] to Mexicana and its assets in the United States." (Amended TRO ¶ 3).

16.     By order entered on August 4, 2010, the Mexico Court provided for immediate provisional injunctive relief (the "Concurso Injunctions"), containing "preventive injunctions" 1-32, which, among other things, prohibited Banorte, through its agent INB, from transferring, stopping, withholding, charging, offsetting and/or using the resources located or that could be located in the Collateral Accounts.

17.     By order entered on August 5, 2010, the Mexico Court modified the Concurso Injunctions (the "Modification Order"), in accordance with Mexicana's request, to carve out Banorte and a number of other banks and lenders from preventive injunctions 9-31 of the Concurso Injunction.

18.     While the Modification Order relieved Banorte from some of the injunctive measures of the Concurso Injunctions [it left in place certain injunctive measures of general applicability].

19.     Banorte understands from publicly available sources and press releases that, as of August 3, 2010, Mexicana ceased selling tickets for new flights and has reduced or eliminated its operations on a number of international routes.  Banorte further understands that certain of

Mexicana's employees have offered to work for no pay while Mexicana seeks to address the extraordinary strains on its business, including its ongoing labor negotiations.

20.     While Banorte is cautiously encouraged by some recent press reports indicating that Mexicana has resumed certain on-line ticket sales and has begun re-instituting service on closed routes, these are hardly indicators of a return to normalcy for Mexicana, and the airline is still far from operating within the "ordinary course" of business. *See, e.g.*, Press Release 09: Mexicana Airlines Temporarily Reinstates Mexico City-Caracas Route, http://cmainforma.com/press-releases, Aug. 11, 2010 (**Exhibit H**) ("As far as possible, Mexican Airlines will be reinstating flights previously suspended in the interests of passengers.").

21.     Upon information and belief, Banorte does not believe that all funds have been deposited in its Collateral Account relating to American Express, Visa, or Mastercard ticket sales since the commencement of Mexicana's bankruptcy proceedings pursuant to the applicable financing agreements.

## ARGUMENT

## I.     INTRODUCTION: PRELIMINARY INJUNCTIONS IN THE CONTEXT OF CHAPTER 15

22.     In a typical chapter 11 proceeding, section 362's automatic stay is immediately implemented, providing broad protections to debtors. 11 U.S.C. § 362; *see Shaw v. Ehrlich*, 294 B.R. 260, 267 (W.D. Va. 2003). These protections, however, are not boundless.

23.     Section 362 creates the automatic stay, but conditions the scope and effect of the stay in certain circumstances. In particular, section 362(d)(1) authorizes relief from the stay with respect to property in which a secured creditor has an interest, if that security interest is not adequately protected. *See, e.g., In re 160 Bleecker Street Associates*, 156 B.R. 405, 413 (S.D.N.Y. 1993). "Adequate protection" is defined in section 361, which provides that such

protection may be provided by cash payment, replacement liens, or other such relief. 11 U.S.C. § 361. Section 362(d)(2) provides another avenue for relief from the stay where the debtor has no equity in the collateral and that collateral is not necessary to the debtor's reorganization. *See, e.g.*, *In re 160 Bleecker Street Associates*, 156 B.R. at 410.

24.     In addition, while section 363 permits a debtor to generally use or sell its property, sections 363(c) and (d) prohibit a debtor from using cash collateral without the consent of the secured party or approval of the court, after a finding that the secured party is adequately protected. *In re Cross Baking Co., Inc.*, 818 F.2d 1027 (1st Cir. 1987).

25.     In contrast, under chapter 15, a debtor does not immediately receive the above protections upon petitioning for recognition. Rather, under section 1520, the protections of 361, 362, and 363 come into effect only upon entry of an order granting recognition. Upon coming into effect, the automatic stay is subject to all of the usual secured creditor protections that apply under chapter 11. *In re Tri-Continental Exchange Ltd.*, 349 B.R. 627, 637 (Bankr. E.D. Ca. 2006).

26.     In the gap between the application for recognition and the granting of recognition, however, foreign debtors are not protected by this stay. To preserve the debtor's U.S. property during this gap, courts are authorized under section 1519 to grant provisional relief, consistent with the usual injunction standards requiring a showing of irreparable harm and either a likelihood of success on the merits or a balance of hardships. *In re Qimonda AG*, 2009 WL 2210771 (Bankr. E.D. Va. July 16, 2009). Section 1522 further authorizes courts to create, modify, or terminate the provisional relief in order to "sufficiently protect" creditors and the debtor, and courts have wide latitude to mold this relief. *In re Tri-Continental*, 349 B.R. at 637.

A12372127

27.     The requirement of recognition exists as a means for the U.S. judicial system to assess the credibility of a foreign proceeding, and determine the extent to which comity should be granted. *In re Iida*, 377 B.R. 243, 257 (9th Cir. B.A.P. 2007). In principle, therefore, it would be absurd for injunctive relief granted *prior to recognition* to provide greater protections for the Debtor than the injunctive relief available to the Debtor *post-recognition*. *See* Interim Order Granting Foreign Representative's Emergency Request for Relief Under 11 U.S.C. §§ 1519, 105 and 362(a), *In re Deloitte & Touche, Inc. as Foreign Representative of Evergreen Gaming Corp.*, No. 09-13567 (Bankr. W.D. Wa. April 17, 2009)(imposing adequate protection prior to recognition order).

## II.     MEXICANA CANNOT SATISFY THE STANDARDS FOR THE ENTRY OF A PRELIMINARY INJUNCTION UNDER SECTION 1519(e) WITH RESPECT TO BANORTE, WITHOUT PROVIDING BANORTE WITH ADEQUATE PROTECTION FOR THE VALUE OF ITS COLLATERAL

28.     Section 1519(e) of the Bankruptcy Code requires that any request for relief under section 1519 meet the standards applicable to a request for injunctive relief. 11 U.S.C. § 1519(e) ("The standards, procedures, and limitations applicable to an injunction shall apply to relief under this section."). A debtor is entitled to injunctive relief only if it makes a showing of (i) irreparable harm absent relief and (ii) either (a) probability of success on the merits or (b) if there is doubt as to the merits, that the balance of hardships weighs in favor of the party seeking injunctive relief. *In re Northwest Airlines Corp.*, 349 B.R. 338, 383 (S.D.N.Y. 2006). "It frequently is observed that a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (internal quotations omitted). In seeking this relief against Banorte, Mexicana fails to meet its burden.

### A. Mexicana Cannot Demonstrate That It Will Suffer Irreparable Harm If Banorte Is Carved Out From The Injunction.

29.     Mexicana cannot meet its burden of showing irreparable harm.  In the Second Circuit, "irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Grand River Enterp. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007).  The moving party must meet its burden as to the likelihood of irreparable injury "before the other requirements for the issuance of an injunction will be considered." *Id.*  To establish such harm, the moving party must "demonstrate an injury that is neither remote nor speculative, but actual and imminent," and the harm must be "likely, not merely possible." *In re First Republic Group Realty*, 421 B.R. 659, 678 (Bankr. S.D.N.Y. 2009).

30.     Mexicana cannot demonstrate that it will suffer irreparable harm absent the relief it seeks as to Banorte.  If the limitations to which Banorte is entitled are enforced, they would not interfere in any appreciable way with the Debtor's ability to reorganize.  The Debtor would still be permitted to use its cash collateral in the ordinary course of business, while Banorte would simply have protections to which it is already entitled.  Any claim that the Debtor would somehow be harmed by granting additional replacement liens or other reasonable protections to Banorte is plainly "remote or speculative," and not the "actual and imminent" harm required to justify an injunction.

### B. Mexicana Cannot Demonstrate A Likelihood Of Success On The Merits Regarding Its Attempt To Impose The Automatic Stay On Banorte After Recognition.

31.     Even if Mexicana could demonstrate irreparable harm, it has not established a likelihood of success on the merits because the automatic stay, which would be implemented upon the Court's recognition of Mexicana's foreign main proceeding, would likely be lifted as to Banorte.

32.     Preliminary injunctions are by their nature temporary relief pending the outcome of some later permanent determination.  In the reorganization context, the "success on the merits" element of the preliminary injunction test is generally recognized as involving an analysis of the likelihood that the debtor will confirm a plan of reorganization.  *In re Calpine Corp.*, 435 B.R. 45, 50 (Bankr. S.D.N.Y. 2006).  In a chapter 15 context, the debtor seeks the preliminary injunction in order to preserve the estate while the order for recognition – which would provide the stay protections of sections 362 and 363 – is pending.  Therefore, in this chapter 15 context, interpreting the likelihood of "success on the merits" means deciding whether an order for recognition is likely to provide the relief the debtor seeks.

33.     Upon recognition of a foreign main proceeding, section 1520 of the Code mandates that several sections of the Code, including sections 361, 362 and 363, immediately become applicable to the property of the Debtor within the United States.  11 U.S.C. § 1520(a)(1)-(3).  While the implementation of these sections instantly provides a foreign debtor these protections of the Bankruptcy Code, it also limits those protections to the same extent they are limited in the Bankruptcy Code.

34.     Therefore, while the application of section 362 gives a debtor the broad protections of the automatic stay, those rights are limited by section 362(d)(1), which allows a party in interest to seek, and requires a court to grant, relief from the automatic stay "for cause, including the lack of adequate protection of an interest in property of such party in interest." Section 361, also made applicable by section 1520 upon recognition, states that a debtor can provide adequate protection by requiring cash payments to the secured creditor, providing additional or replacement liens to the extent of the security's diminution in value, or granting

other relief resulting in the secured party receiving the "indubitable equivalent" of its interest in the security. 11 U.S.C. § 361.

35.     Here, upon recognition of the foreign main proceeding, relief from the automatic stay would be required under section 362(d)(1), as the value of Banorte's cash collateral is being depleted and Banorte's interests are not being adequately protected. Despite its continued use of Banorte's cash collateral, which Mexicana has not demonstrated it can replenish because it has suspended new ticket sales, Mexicana has not offered adequate protection as would be required by sections 361 and 362, nor has Mexicana made a showing that it has any ability to protect Banorte against the further depletion of its cash collateral.

36.     The only "protections" to Banorte and other creditors that Mexicana offers is a statement by the Foreign Representative that:

> "[d]uring the period of time in which injunctive relief remains in place, Mexicana will continue to preserve and operate its business as a going concern....Mexicana will not dispose of assets in the United States (out of the ordinary course of business). Thus the assets of Mexicana will not be irretrievably depleted to the detriment of creditors while the relief sought by Mexicana is in place." (Johansen Decl. ¶ 21).

As Mexicana ceased selling new tickets nearly simultaneously with entry of the TRO, and soon thereafter discontinued operating numerous international routes, the above statement, to the extent well-intentioned when made, became inaccurate almost immediately after the Amended TRO was entered. Accordingly, Banorte does not believe that Mexicana was properly authorized to withdraw any amounts from the Collateral Accounts on the basis of the Amended TRO and reserves all rights to recover funds improperly drawn by Mexicana in this regard.[2]

---

[2]     Moreover, the Foreign Representative's statement that the funds in the Collateral Accounts would be used for Mexicana's reorganization costs is inconsistent with the assurance that funds would only be used in the ordinary course of Mexicana's business.

37.	Upon recognition, Banorte may also seek relief from the stay under 362(d)(2), which permits such relief where the debtor has no equity in the collateral, and the collateral is not necessary for reorganization. Upon information and belief, the amount of cash in the Collateral Accounts and the proceeds thereof is likely well below the amount of the obligations that Mexicana owes to Banorte, and Mexicana therefore has no equity in such funds. To the extent that current indicators prove correct, and Mexicana is unable to reorganize, the Collateral Accounts will not be necessary for reorganization. To the extent Mexicana is able to reorganize, the adequate protection sought by Banorte will not hinder that effort.

38.	Perhaps most to the point, while upon recognition the application of section 363 will broadly enable the Debtor to use or sell property of the estate, that power will be limited by section 363(c)(2), which prevents a trustee from using, selling, or leasing cash collateral without the consent of all who have interests in that collateral, or authorization from the Court. Were recognition to be granted, the requirements of section 363(c)(2) would prevent the Debtor from using cash in the Collateral Accounts without the consent of Banorte, or a finding from the Court that Banorte is adequately protected.

39.	The adequate protection sought by Banorte in this objection will be required instantly upon Banorte's recognition. The "likelihood of success" of Mexicana circumventing that obligation, as it seeks to do here, is virtually nil.

**C.	The Balance Of Hardships Tilts Towards Banorte**

40.	The balance of hardships weighs in favor of Banorte. In addition to showing irreparable harm, where success on the merits is in doubt, the movant "must also establish that the non-moving party or other parties will not suffer substantial harm if the stay is granted." *In re Adelphia Communications Corp.*, 361 B.R. 337, 349 (Bankr. S.D.N.Y. 2007).

41.     The Preliminary Injunction is poised to do substantial harm to Banorte and its rights as a secured lender. If the Preliminary Injunction is entered in its current form, Mexicana will continue to have virtually unfettered access to Banorte's cash collateral without having made any demonstration of its ability to continue as a going concern or sufficiently protect Banorte's rights. This would only further diminish the value of Banorte's cash collateral, which is being depleted every day that Mexicana remains in operations. On August 11, 2010 Mexicana's CEO Manuel Borja admitted as much when he explained that during the week and a half that Mexicana has been operating without revenue, the company has spent the equivalent of $47.1 million. Doug Cameron and Paul Kiernan, *UPDATE: Mexicana Resumes Online, Agency Ticket Sales*, Wall Street Journal, August 11, 2010, http://online.wsj.com/article/BT-CO-20100811-711754.html (**Exhibit I**). As Mexicana's primary lender, Mexicana's continued operations over this period have been conducted at Banorte's expense. Banorte has already suffered the hardship of a substantial loss in its collateral, and stands to continue being harmed as its cash collateral continues to be used, without being replenished by new revenues.

42.     Further, the hardship suffered by Mexicana by granting Banorte the relief requested herein is unlikely to exceed the hardship caused by Banorte to date by virtue of its own actions. In its Application, Mexicana warned that "[e]ven the mere threat of [creditor action against Mexicana's assets] could undermine the confidence of Mexicana's customers and suppliers, causing Mexicana considerable distraction and loss of value as it moves forward with its restructuring in the Concurso Proceeding or worse, disrupting Mexicana's flight operations." (Application at 21). Mexicana continued by stating that "[s]uch developments would hinder Mexicana's ability to operate its airline business at even the most basic level, causing severe disruption to Mexicana's flight schedules and seriously damaging Mexicana's credibility in the

marketplace…" (Application at 21). Nevertheless, almost immediately after the Amended TRO, and notwithstanding these statements, Mexicana suspended ticket sales, assuring the flying public that it would continue to honor existing tickets. Within days, and again contrary to its initial assurances, Mexicana announced that it would be dramatically curtailing its international operations.

43.     By comparison to the harm caused by Mexicana's own actions, the granting of adequate protection will not cause any further material harm to Mexicana, as it will still be permitted to use the cash collateral so long as Mexicana protects Banorte's interest to the extent of any diminution of value of its collateral and by providing other common protections to a lender secured by cash collateral.

44.     The extraordinary hardship that Banorte has suffered and continues to suffer as a result of these injunctions vastly outweighs the potential for any marginal reduction of customer and investor confidence in Mexicana in light of recent events. The scales tip heavily towards Banorte.

## III.    SECTION 1522 REQUIRES THAT RELIEF GRANTED UNDER SECTION 1519 BE GRANTED, MODIFIED, OR TERMINATED ONLY IF THE INTERESTS OF CREDITORS AND THE DEBTOR ARE "SUFFICIENTLY PROTECTED."

45.     The Amended TRO was granted, and the Preliminary Injunction sought by Mexicana would be granted, pursuant to section 1519 of the Code, which permits injunctive relief in the time between the petition for recognition under chapter 15 and the granting of such recognition.

46.     A party affected by such relief, or by discretionary relief granted post-recognition under section 1521, is entitled to seek its own relief or protection under section 1522 of the Code, which instructs a court to structure such relief so that "the interests of the creditors and other interested entities, including the debtor, are sufficiently protected." 11 U.S.C. § 1522. To

A12372127

16

effect that balance, courts have a variety of tools, and are explicitly permitted to issue the injunctions subject "to conditions it considers appropriate," including the giving of security or the filing of a bond. *Id.* Courts may also at any point modify or terminate such injunctive relief at the request of an affected entity. *Id.* The interests of *all* creditors – not just U.S. creditors – are to be considered. *In re SPhinX*, 351 B.R. 103, 113 (Bankr. S.D.N.Y. 2006).

47.     The standards by which a Court should ascertain "sufficient protection" under section 1522 have been only sparsely interpreted. Courts have found, however, that in determining "sufficient protection," they should "emphasize the need to tailor relief and conditions so as to balance the relief granted to the foreign representative and the interests of those affected by such relief, without unduly favoring one group of creditors over another." *In re Tri-Continental*, 349 B.R. at 637, *cited approvingly in In re Atlas Shipping A/S*, 404 B.R. 726 (Bankr. S.D.N.Y. 2009). The Court has "broad latitude to mold relief to meet specific circumstances," in order to achieve the objective of "sufficient protection." *In re Tri-Continental*, 349 B.R. at 637.

48.     Under United States law, secured creditors enjoy a "special protected status," and the public policy protecting that interest can even override interests of comity. *In re Treco*, 240 F.3d 148 (2d Cir. 2001) (in a case under section 304, the predecessor to chapter 15, finding that Bahamian insolvency system allowing for payment of administrative claims prior to payment of secured creditors might be a sufficient deviation from the U.S. bankruptcy code to prevent turnover of assets within the U.S. to the foreign debtor).

49.     It is difficult to imagine any interpretation of "sufficient protection" that would permit the granting of an injunction against a secured party to prohibit it from foreclosing on its security, as the Debtor sweeps the assets at will, neglecting to replace them and cutting off the

only means of revenue that might possibly replenish the diminution in value. The Court should use its broad latitude to shape the requested provisional relief to exclude and sufficiently protect Banorte.

**IV. MEXICANA HAS "UNCLEAN HANDS" AND SHOULD NOT BE PERMITTED TO BENEFIT FROM THE EQUITABLE RELIEF OF A PRELIMINARY INJUNCTION.**

50. A preliminary injunction is a form of equitable relief. Such equitable relief may be denied movants who have not acted in good faith, and thus have "unclean hands." *See Shokin v. Geller*, 16 Misc. 3d 1110(A) at *3 (N.Y. Sup. Ct. 2007) ("A grant of a preliminary injunction will not be ordered if the plaintiff comes to the court with 'unclean hands.'"); *Amarant v. D'Antonio*, 197 A.D.2d 432, 434 (App. Div., 1st Dep't 1993) (denying injunctive relief because, in part, "[i]t is an ancient maxim that he who comes to equity must come with clean hands.").

51. In seeking to acquire injunctive relief, the Foreign Representative represented in the Johansen Declaration that, if relief were granted, Mexicana would use its cash resources only in the "ordinary course" of business. Despite that representation, the Debtor has, upon information and belief, withdrawn funds from the Collateral Accounts after it announced that it would cease new ticket sales. By ceasing ticket sales and canceling flights, Mexicana no longer continued operating in the "ordinary course of business" in any sense of that phrase, and, in the process, began depriving Banorte of the value of its collateral without compensation.

52. In addition, the Foreign Representative has exceeded the rights granted her in the Amended TRO. While she was "entrusted with the administration or realization of Mexicana's assets in the United States," nowhere in the Amended TRO was she granted permission to make "distributions." The distinction between "administration or realization" and "distribution" is apparent in the text of chapter 15: section 1521(a)(5) allows a judge to entrust the foreign representative with the "administration or realization" of the estate, while section 1521(b) allows

A12372127

18

a judge to entrust the foreign representative with "distribution of all or part of the debtor's assets located in the United States," so long as it is satisfied "that the interests of creditors in the United States are sufficiently protected." 11 U.S.C. 1521(a)(5), 1521(b). The distinction between the two can be significant. *See Tri-Continental*, 349 B.R. at 636 (finding that creditors were sufficiently protected where the foreign representative was entrusted only with administration or realization, but not distribution, of the assets, and the collateral would be staying within the jurisdiction of the court); *see also* 8 Alan N. Resnick & Henry J. Sommer, *Collier on Bankruptcy* ¶ 1521.02 (section 1521(a)(5) "stops short of allowing repatriation or distribution, which are dealt with in section 1521(b)").

53.     Banorte has received no information as to how its collateral is being spent, but in light of the fact that Mexicana cannot remotely be said to be operating in the "ordinary course of business," it must assume that the funds are being swept from the accounts into the hands of other creditors, and perhaps out of the reach of the Court. Such distributions are not permitted under the Amended TRO. Unlike the creditors in *Tri-Continental*, Banorte does not have the comfort of knowing that its assets, while being administered and realized by the Foreign Representative, will remain within this Court's jurisdiction.

## V.     UNITED STATES PUBLIC POLICY DEMANDS PROTECTION OF BANORTE'S RIGHTS AS A SECURED CREDITOR, AND SUCH PROTECTIONS HAVE BEEN HELD TO OVERRIDE COMITY CONSIDERATIONS.

54.     The United States has a strong public policy favoring the payment in full of secured obligations prior to all other obligations. In the leading case, *In re Treco*, 240 F.3d 148, the court found that public policy so favored the priority given to secured creditors that the policy overrode considerations of comity. As a result, the court refused to allow a foreign debtor to turn over assets to its Bahamian foreign representative, where Bahamian law allowed

administrative claims to be paid before secured claims. *Id.* Although decided before the enactment of chapter 15, the policy articulated in *In re Treco* is equally applicable here.

55.     Whatever comity is due the Concurso Proceeding prior to recognition is outweighed by the United States' public policy concern for the treatment of secured creditors.

## **CONCLUSION**

56.     The undue hardship that Banorte has suffered should not continue. Banorte should be excluded from the effects of the Preliminary Injunction, and necessary and appropriate protections of Banorte's interest as a secured creditor must be included in the Preliminary Injunction. Banorte is encouraged by press reports indicating that Mexicana has resumed certain on-line ticket sales and has begun re-instituting service on closed routes. While Banorte hopes that such positive signs can give Mexicana the flexibility to begin to adequately protect the value of Banorte's collateral in a way that it has been otherwise unable to do to this point, the Bankruptcy Code does not permit such adequate protection to be left to chance or the whims of the market.

WHEREFORE, for the reasons set forth above, the Banorte respectfully requests that the Court (1) exempt Banorte from the Preliminary Injunction with respect to its US cash collateral, (2) ensure that Banorte's interests are expressly and adequately protected in the Preliminary Injunction by the inclusion of the provisions described in paragraph 7 above (3) and grant such other or further relief as is just and proper.

Dated: New York, New York
August 15, 2010

Respectfully submitted,

Linklaters LLP

By:   /s/ Paul S. Hessler
      Martin N. Flics
      Paul S. Hessler
1345 Avenue of the Americas, 19th Floor
New York, NY 10105
(212) 903-9000
(212) 903-9100 (fax)
martin.flics@linklaters.com

*Attorneys for Banco Mercantil del Norte, S.A.*