Martin N. Flics
Paul S. Hessler
LINKLATERS LLP
1345 Avenue of the Americas
New York, NY 10105
(+1) 212 903 9000 (Tel)
(+1) 212 903 9100 (Fax)

*Attorneys for Banco*
*Mercantil del Norte, S.A.*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x

*In re*                                              

COMPANIA MEXICANA DE AVIACION, S.A. de
C.V.,

          Debtor in a Foreign Proceeding.

Chapter 15

Case No. 10-14182 (MG)

-------------------------------------------------------x

### OBJECTION OF BANCO MERCANTIL DEL NORTE, S.A. TO FOREIGN REPRESENTATIVE'S VERIFIED PETITION FOR RECOGNITION OF FOREIGN MAIN PROCEEDING AND REQUEST FOR CHAPTER 15 RELIEF

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................................................ii

PRELIMINARY STATEMENT.............................................................................................. 1

BACKGROUND....................................................................................................................... 3

    A.    Pre-bankruptcy relationship between Banorte and Mexicana ....................................3

    B.    The Bankruptcy Proceedings..................................................................................5

RELIEF REQUESTED ........................................................................................................... 11

ARGUMENT .......................................................................................................................... 11

I.     USE OF CASH COLLATERAL WITHOUT ADEQUATE PROTECTION IS NOT PERMITTED UNDER THE AUTOMATIC RELIEF AVAILABLE UPON RECOGNITION UNDER SECTION 1520 ........................................................................ 12

II.    RECOGNITION OF MEXICANA'S CONCURSO PROCEEDING BY THIS COURT PURSUANT TO CHAPTER 15 OF THE BANKRUPTCY CODE SHOULD BE CONDITIONED ON THE WITHDRAWAL OF THE STAY REINSTATEMENT ORDER BY THE MEXICAN COURT ........................................... 13

    A.    The Stay Reinstatement Order is Manifestly Contrary to U.S. Public Policy Protecting Secured Creditors...................................................................................... 15

         1.    Statutory and Constitutional Right to Adequate Protection............................. 16

         2.    Procedural Unfairness...................................................................................... 17

    B.    Conditioning Recognition on the Withdrawal of the Stay Reinstatement Order is appropriate under the circumstances ....................................................................... 19

CONCLUSION ....................................................................................................................... 20

**TABLE OF AUTHORITIES**

Page

**CASES**

*In re Atlas Shipping A/S*,
404 B.R. 726 (Bankr. S.D.N.Y. 2009) ........................................................................ 14

*In re Basis Yield Alpha Fund (Master)*,
381 B.R. 37 (Bankr. S.D.N.Y. 2008) .......................................................................... 11

*In re Bd. of Dirs. of Hopewell Int'l Ins. Ltd.*,
272 B.R. 396 (Bankr. S.D.N.Y. 2002) ........................................................................ 19

*In re Bd. of Dirs. of Hopewell Int'l Ins. Ltd., Inc.*,
238 B.R. 25 (Bankr. S.D.N.Y. 1999) .......................................................................... 18

*In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*,
389 B.R. 325 (S.D.N.Y. 2008) .................................................................................... 11

*Hilton v. Guyot*,
159 U.S. 113 (1895) ............................................................................................. 17, 18

*In re Hourani*,
180 B.R. 58 (Bankr. S.D.N.Y. 1995) .......................................................................... 17

*In re Metcalfe & Mansfield Alternative Invs.*,
421 B.R. 685 (Bankr. S.D.N.Y. 2010) ................................................................... 15, 18

*Muscletech Research & Dev. Inc. v. Aguilar (In re Ephedra Prods. Liab. Litig.)*,
349 B.R. 333 (S.D.N.Y. 2006) ............................................................................. 19, 20

*N.H. Bus. Dev. Corp. v. Cross Baking Co. (In re Cross Baking Co.)*,
818 F.2d 1027 (1st Cir. 1987) .................................................................................... 13

*In re Papeleras Reunidas, S.A.*,
92 B.R. 584 (Bankr. E.D.N.Y. 1988) .......................................................................... 17

*In re Toga Mfg. Ltd.*,
28 B.R. 165 (Bankr. E.D.Mich. 1983) ........................................................................ 17

*Treco v. Treco (In re Treco)*,
240 F.3d 148 (2d Cir. 2001) ........................................................................... 14, 16, 17

*In re Tri-Cont'l Exchange Ltd.*,
349 B.R. 627 (Bankr. E.D. Ca. 2006) ......................................................................... 12

# STATUTES

11 U.S.C. § 105 ............................................................................................................... 1

11 U.S.C. § 361 ................................................................................................... 1, 12, 16

11 U.S.C. § 362 ................................................................................................... 1, 12, 16

11 U.S.C. § 363 ............................................................................................. 1, 12, 13, 16

11 U.S.C. § 1506 ............................................................................................................. 1

11 U.S.C. § 1507 ............................................................................................................. 1

11 U.S.C. § 1517 ..................................................................................................... 15, 18

11 U.S.C. § 1520 ................................................................................................... 1, 2, 12

11 U.S.C. § 1521 ............................................................................................................. 1

11 U.S.C. § 1522 ............................................................................................................. 1

11 U.S.C. § 1525 ........................................................................................................... 19

# OTHER AUTHORITIES

H.R. Rep. No. 109-31, pt. 1 at 109 (2005) ................................................................. 14

Pursuant to sections 1506, 1507, 1520, 1521, 1522, 361, 362, 363 and 105 of title 11 of the United States Code (the "**Bankruptcy Code**"), Banco Mercantil del Norte S.A. ("**Banorte**"), by and through its undersigned counsel, hereby files this objection to the Foreign Representative's Verified Petition for Recognition of Foreign Main Proceeding and Request for Chapter 15 Relief (the "**Objection**"), and in support thereof states as follows:

## PRELIMINARY STATEMENT

1.      On August 18, 2010, this Court granted a preliminary injunction (the "**Preliminary Injunction**") barring Mexicana's[1] creditors from taking certain actions to interfere with its assets and operations located in the United States. Banorte objected to the Preliminary Objection on the ground that Mexicana should not be permitted to use Banorte's cash collateral without providing Banorte with adequate protection as required by sections 362 and 363 of the Bankruptcy Code, which section 1520 of the Bankruptcy Code makes automatically applicable upon recognition. In response to Banorte's objection, Mexicana insisted instead on carving Banorte out of the Preliminary Injunction, ostensibly leaving Banorte free to pursue its contractual remedies. But only two days after representing to the Court that Banorte would be free to exercise its remedies, Mexicana obtained an *ex parte* order from the Mexican courts enjoining (among others) Banorte and Inter National Bank ("**INB**"), as Banorte's collateral agent, from enforcing against the Collateral Accounts (defined below), including the Collateral Accounts located in the United States. Moreover, Mexicana's new owners have threatened to commence criminal proceedings against Banorte in Mexico as a result of Banorte's exercise of its contractual remedies.[2]

---

[1]      "**Mexicana**" refers to the Debtor, Compania Mexicana de Avacion S.A. de C.V.

[2]      *See Mexicana bringing criminal charges against boards of Banorte, HSBC - reports*, Business News Americas, August 27, 2010,

2.     The result is a form of jurisdictional arbitrage, by which Mexicana is gaming the system by seeking to obtain this Court's recognition of its Mexican bankruptcy proceeding while avoiding the express requirements of the Bankruptcy Code and subverting the stringent Constitutional and statutory protections that United States law provides to secured creditors. This Court should not permit Mexicana to play what is, in effect, an elaborate jurisdictional shell game in which Mexicana seeks and obtains certain relief in one jurisdiction, only to later seek to overturn the very same relief through its actions in another.

3.     Accordingly, Banorte files this objection to recognition of Mexicana's Concurso Proceeding as a foreign main proceeding. To the extent that Mexicana seeks recognition of its Concurso Proceeding (defined below) in this Court under chapter 15, Banorte should be afforded the protections afforded to secured creditors under the Bankruptcy Code with respect to property located in the United States. Pursuant to the express terms of section 1520 of the Bankruptcy Code, the Court should order that Mexicana provide adequate protection to Banorte and should grant recognition, if at all, only on the express condition that Mexicana immediately seek and obtain the vacatur of the Mexican Injunction and the Stay Reinstatement Order (both defined herein) and agree not to seek or enforce any orders in Mexico or elsewhere that would undermine this Court's authority over assets located in the United States. Banorte therefore objects to recognition unless this Court's recognition order (1) affords Banorte the same protections that creditors secured by cash collateral are given under the Bankruptcy Code with respect to its cash collateral located in the United States, and (2) is conditioned on Mexicana not taking any actions in Mexico or elsewhere that would undermine the protections afforded to creditors with respect to property located in the United States.

---

http://www.bnamericas.com/story.xsql?id_sector=3&id_noticia=529053&Tx_idioma=1&source= (**Exhibit A**)

## BACKGROUND

**A.    Pre-bankruptcy relationship between Banorte and Mexicana**

4.    On April 17, 2008, Banorte entered into a $1,572,420,000.00 (Mexican Pesos)

Credit Agreement among Mexicana, Aero Caribe S.A. de C.V. ("**Click Mexicana**") and Grupo

Mexicana de Aviacion S.A. de C.V., as guarantors, and Gamma Servicios de Negocios, S.A. de

C.V. as borrower (as amended, the "**Credit Agreement**")[3] (Certified Translation in **Santos-**

**Cernuda Declaration, Exhibit A**).  The Credit Agreement, which is governed under Mexican

law, is the primary financing vehicle on which Mexicana has relied to fund its operations.

(Johansen Decl. Pursuant 28 U.S.C. § 1746, August 2, 2010 ("**Johansen Decl.**" or "**Johansen**

**Declaration**") ¶ 14).

5.    The obligations of Mexicana and its non-debtor affiliates under the Credit

Agreement are supported by the proceeds of Mexicana's Mexican and U.S. ticket sales sold

through American Express, Visa and MasterCard.  In Mexico, the parties entered into an

Irrevocable Administration and Source of Payment Trust contract under Mexican law (as

amended, the "**Original Trust**") (Certified Translation in **Santos-Cernuda Declaration,**

**Exhibit B**) with HSBC Mexico, S.A. ("**HSBC Mexico**") as trustee, Banorte as first beneficiary

and the Mexicana Obligors as trustors and second beneficiaries (in relation to the amounts that

each contributed).  Pursuant to the Original Trust, applicable proceeds of Mexican credit card

ticket sales would flow into one or more collection accounts over which Banorte has rights as the

primary beneficiary.  Upon the occurrence and during the continuance of an event of default, the

Trustee is authorized to transfer funds in the collection accounts to the party indicated by

---

[3]    As of the Petition Date (defined below), the obligors under the Credit Agreement were: Mexicana, Click
Mexicana, Gamma Servicios de Negocios, S.A. de C.V., Mexicana Inter., S.A. de C.V. ("**Mexicana**
**Link**"), Nuevo Grupo Aeronautico, S.A. de C.V. ("**Grupo Mexicana**"), Mexicana MRO, S.A. de C.V.,
Servicios Frecuenta, S.A. de C.V. (collectively, the "**Mexicana Obligors**")

Banorte to be applied against amounts owed under the Credit Agreement. (Original Trust at § 5(h)).

6.       To achieve a similar result in the U.S. with respect to U.S.-based ticket sales, Banorte, Mexicana, Mexicana Link and INB entered into a Deposit Account Security Agreement dated as of June 16, 2008 (the "**Security Agreement**") pursuant to which Mexicana pledged, among other things, its interests in account numbers 0664812 and 0664820 at INB (the "**Collateral Accounts**") to INB, as collateral agent for Banorte. (**Santos-Cernuda Declaration, Exhibit C**). As of the same date, Banorte and INB entered into a Collateral Agency Agreement (the "**Collateral Agency Agreement**") pursuant to which Banorte appointed INB to act as collateral agent for and on behalf of Banorte under the Security Agreement. (**Santos-Cernuda Declaration, Exhibit D**). The Collateral Accounts are the collection accounts into which the proceeds of U.S. ticket sales from credit card purchases flow. (Security Agreement at § 4.3).

7.       These proceeds are derived from U.S. Bank National Association ("**U.S. Bank**") and American Express Travel Related Services Co. ("**AmEx**", and together with U.S. Bank, the "**Credit Card Servicers**"), under the Agreement Between U.S. Bank and Mexicana, dated June 12, 2002 (the "**U.S. Bank Agreement**") (**Santos-Cernuda Declaration, Exhibit E**), and the Terms and Conditions for Worldwide Acceptance of the American Express Card by Airlines between Mexicana and AmEx, dated May 10, 2006 (the "**AmEx Agreement**," and together with the U.S. Bank Agreement, the "**Cards Payment Agreements**") (**Santos-Cernuda Declaration, Exhibit F**).

8.       Section 10.14 of the Security Agreement states that the Security Agreement and the related security interest shall terminate only when the secured obligations "have been indefeasibly paid in full in cash."

9.      Banorte and Mexicana had numerous discussions regarding Mexicana's financial condition during the months leading up to Mexicana's commencement of insolvency proceedings, including with respect to the possibility that Mexicana would seek bankruptcy protection.

10.      Upon information and belief, Mexicana regularly assured Banorte that any bankruptcy filing by Mexicana would not in any way implicate, affect or prejudice Banorte's rights under the Credit Agreement.  Given this context, Banorte was surprised to learn that it was named among the parties against whom Mexicana sought relief in both Mexico and New York.

**B.      The Bankruptcy Proceedings**

11.      On August 2, 2010 (the "**Petition Date**") Mexicana initiated a voluntary judicial reorganization proceeding (the "**Concurso Proceeding**") pursuant to provisions of the *Ley de Concursos Mercantiles* (the "**Mexican Business Reorganization Act**" or "**Concurso Law**") by submitting its voluntary petition to commence a case under the Mexican Business Reorganization Act to the Mexican Court.

12.      In connection with the Concurso Proceeding, Mexicana sought, and obtained, on an *ex parte* basis, far-reaching injunctive relief (the "**Mexican Injunction**"), including numerous specific injunctions against Banorte and other financial creditors from taking enforcement actions against Mexicana.  While the Debtors have not provided a certified translation of this order, they do provide, as Exhibit D to the Declaration of Maru E. Johansen Pursuant to 28 U.S.C. § 1746, a certified translation of their requests for relief, and informal translations of the Mexican Injunction make clear that the Mexican Court granted these requests.  Of particular relevance here, the Mexican Court granted the following forms of *ex parte* relief:  (a) **Relief 7**: Providing Third Party Injunctive Relief For "joint debtors, endorsers and guarantors;" (b) **Relief 24**: Prohibiting INB from enforcing its default rights under the Security Agreement; (c) **Relief**

**25**: Prohibiting INB from exercising any control over amounts in the Collateral Accounts; (d) **Relief 26**: Compelling continued turnover of the existing funds in the Collateral Accounts to Mexicana. In short, the Mexican Court affirmatively ordered HSBC, as Trustee, and INB, as collateral agent, to continue to transfer funds in the Collateral Accounts and the Original Trust to Mexicana and ordered that Mexicana's relief extend not only to Mexicana, but also to affiliated, third party joint debtors, notwithstanding the fact that such joint debtors are not subject to bankruptcy proceedings in any jurisdiction.

13. On the same date, Maru E. Johansen (the "**Foreign Representative**"), in her capacity as proposed foreign representative of Mexicana, filed a petition (the "**Petition**") in this Court under chapter 15 of the Bankruptcy Code for recognition of Mexicana's Concurso Proceeding pending in the Mexico Court as a "foreign main proceeding." Mexicana sought, and obtained, similar injunctive relief on an *ex parte* basis upon the entry of a Temporary Restraining Order, which was subsequently amended (the "**TRO**") and entered by this Court. Notably, and unlike the relief sought and obtained in Mexico, the TRO pertained only to assets of Mexicana in the United States, and not the assets of its affiliated, third party joint debtors.

14. The purported basis for the relief sought was to ensure Mexicana's "consistent and smooth operations without disruption while the Concurso Proceeding moves forward." (Verified Petition at ¶ 7). The Foreign Representative added: "during the time in which injunctive relief remains in place, Mexicana will continue to preserve and operate its business as a going concern. Moreover, Mexicana will not dispose of assets in the United States (out of the ordinary course of business) without advising the Court. Thus, the assets of Mexicana will not be irretrievably depleted to the detriment of creditors while the relief sought by Mexicana is in place... ." (Johansen Decl. at ¶ 21).

15.     Notwithstanding Mexicana's various representations to this Court and to the public that it intended to continue operating its business in the ordinary course, Mexicana suspended all new ticket sales just one day after the Bankruptcy Court entered the TRO. *See* Press Release 05: CMA suspends ticket sales, continues flying normally, http://cmainforma.com/press-releases, August 4, 2010 ("[A]ll ticket sales will be suspended and . . . no tickets will be issued until further notice," but Mexicana "will continue to operate its international flights") (**Exhibit B**).  Further, in addition to suspending ticket sales on all new flights, press reports indicated that (1) Mexicana suspended or reduced scheduled flights on numerous international routes and (2) pilots and certain other employees of Mexicana agreed to work for free for a short time while Mexicana continued its restructuring efforts. *See* Press Release 07: Mexicana Airlines to reduce flights, http://cmainforma.com/press-releases, August 8, 2010;  (**Exhibit C**) *Mexicana needs at least $100 mln to keep flying-CEO*, Reuters, Aug. 10, 2010, http://www.reuters.com/assets/print?aid=USN1016500420100810 ("Mexicana pilots have not been getting paid since Sunday, their union said.") (**Exhibit D**))

16.     On August 5, 2010, Mexicana caused the Mexican Court to withdraw Relief 9 through Relief 32 of the Mexican Injunction, resulting in the withdrawal of the specific injunctive relief regarding Banorte and other of Mexicana's financial creditors, including those provisions which had expressly permitted Mexicana to use funds held in trust for Banorte in collection accounts under Mexican law (the "**Modification Order**") (a certified translation at **Sepulveda Declaration, Exhibit A**).  The Mexican Court, however, did not withdraw Relief 7, the general injunction prohibiting creditors from taking action against Mexicana's affiliates not subject to any insolvency proceeding.

17.     On Wednesday, August 18, 2010, this Court entered the Preliminary Injunction

Order, from which Banorte and INB were expressly and completely carved out at Mexicana's

insistence.  In addition, the Preliminary Injunction contemplated that a number of aircraft

engines and other parts would be returned to their lessors.  Mexicana agreed to return almost

40% of its mainline fleet of aircraft to its lessors, including 12 aircraft to be returned to GE, and

a total of 27 Airbus aircraft.  Shannon, Darren, *Mexicana to Return Almost 40% of Fleet*,

Aviation Week, August 18, 2010,

http://www.aviationweek.com/aw/generic/story_generic.jsp?channel=aviationdaily&id=news/av

d/2010/08/18/02.xml&headline=Mexicana%20To%20Return%20Almost%2040%%20Of%20Fl

eet. (**Exhibit E**).

18.     On August 20, 2010, press reports indicated that 95% of the equity of Grupo

Mexicana was acquired by a consortium of Mexican businessmen called Tenedora K.  Kiernan,

Paul, *Mexico Labor Minister Doubtful of Plans for Troubled Airline*, Wall Street Journal, August

25, 2010, *available at* http://online.wsj.com/article/BT-CO-20100825-712063.html.  (**Exhibit F**).

19.     On August 20, 2010, Banorte delivered an event of default notice to INB (the

"**Event of Default Notice**") (**Santos-Cernuda Declaration, Exhibit G**) in accordance with

section 8.1 of the Security Agreement and section 6 of the Collateral Agency Agreement to

provide notice that an event of default under the Credit Agreement had occurred and was

continuing.  In particular, Mexicana's suspension of new ticket sales, cancellation of numerous

international flight routes, termination of certain aircraft and equipment leases and the sale of

95% of its equity to Tenedora K without Banorte's consent triggered numerous defaults under

the Credit Agreement, including, without limitation, breaches of the following affirmative and

negative covenants: section 16(f) (*Conduct of Business and Preservation of Corporate*

*Existence*), 16(h) (*Maintenance of Assets, etc.*), 17(b) (*Disposal of Assets etc.*), 17(c) (*Change in the Nature and Ownership of the Business*), and 17(d) (*Split-ups, mergers or transfers*). Each of these breaches constitutes an Event of Default under numerous provisions of the Credit Agreement including, without limitation, sections 18(c) (*Specific and Cross Defaults*), 18(d) (*Breach of Other Agreements*), 18(e) (*Insolvency, Dissolution*) and 18(m) (*Material Adverse Effect*).

20.     Upon receipt of written notice delivered by Banorte to INB stating that an event of default has occurred and is continuing, the Security Agreement provides that INB will transfer from the Collateral Accounts all collected funds on deposit therein or received thereafter to the account or accounts specified by Banorte. (*See* Security Agreement at § 8.1(c)). INB will cease making such transfers upon receipt of further written notice from Banorte that the obligations under the Credit Agreement have been paid in full or that all events of default have been cured to the sole satisfaction of Banorte. (*See* Security Agreement at § 8.1(c)). Further, under the Security Agreement, upon receipt of written notice delivered by Banorte that an event of default has occurred and is continuing, INB is specifically empowered to exercise dominion and control over the Collateral Accounts and to refuse to permit further withdrawals from the Collateral Accounts initiated by Mexicana or any of its affiliated grantors. (*See* Security Agreement at §§ 7.1, 8.1(c)).

21.     On Monday, August 23, 2010, Banorte learned that the Mexican Court had granted *ex parte* injunctive relief (the "**Stay Reinstatement Order**") (a certified translation appears at **Sepulveda Declaration, Exhibit B**) in favor of Mexicana, reinstating numerous injunctions that had previously been withdrawn by the Mexican Court on August 5, 2010. Among the *ex parte* injunctive relief that was granted in favor of Mexicana were specific

provisions prohibiting INB from interfering with Mexicana's access to funds deposited in the Collateral Accounts located in the US. Such relief is directly contrary to the carve-out of Banorte and INB from the Preliminary Injunction entered by this Court and to Mexicana's representations to this Court that Banorte would be free to exercise its remedies. Further, Mexicana has provided no assurance whatsoever that it will be in a position to earn money and operate as a going concern to make Banorte whole with respect to outstanding amounts owed.

22.    Banorte timely instituted a *revocacion* proceeding with the Mexican Court to reconsider and reverse the Stay Reinstatement Order, presented on August 27, 2010, and admitted by the court on August 31, 2010. The *revocacion* will likely be decided within fifteen days of admission by the court, although it is possible it will take longer. If Banorte is unsuccessful in its *revocacion* proceeding, it may further appeal the entry of the Stay Reinstatement Order by bringing an *amparo* action against the judge in the Mexican Proceeding pursuant to Mexico's Constitution. This will likely be decided within 30 days after it is filed.

23.    During the pendency of Banorte's appeal under Mexican law of the Stay Reinstatement Order, there will be residual uncertainty regarding the effect of the Stay Reinstatement Order on actions relating to the Collateral Accounts. Although Banorte believes that the Preliminary Injunction was clear in that the carve out given to Banorte and INB overrides any orders of the Mexican Court in the United States, it is not certain to what extent Banorte and/or INB could nonetheless be subject to risk before the Mexican Court for violating the Stay Reinstatement Order.

24.    On August 27, 2010, Grupo Mexicana announced that it was technically insolvent and that it would be indefinitely suspending all flights and related activities, effective midday on

10

August 28, 2010. *See* Press Release 11: Grupo Mexicana suspends flights until further notice, http://mexicanainforma.com/press-releases/, August 27, 2010 (**Exhibit F**).

## RELIEF REQUESTED

25.     For the reasons set forth below, Banorte objects to recognition of Mexicana's Concurso Proceeding, unless any order recognizing the Concurso Proceeding as a foreign main or non-main proceeding expressly provides that:

    a)    section 363 applies with respect to any attempt by Mexicana to use funds in the Collateral Account, irrespective of orders of the Mexican Court;

    b)    Mexicana promptly seeks and obtains the vacatur of the Mexican Injunction, the Stay Reinstatement Order, and any other orders of the Mexican Court asserting the Mexican Court's jurisdiction over the Collateral Accounts;

    c)    Mexicana is barred from seeking any order or other relief in Mexico or elsewhere that would undermine the protections afforded to Banorte under U.S. law; and

    d)    The Court will engage the Mexican Court in communications to ensure the protection of secured creditors in both proceedings.

## ARGUMENT

26.     The granting of recognition to a foreign proceeding is "not a rubber stamp exercise." *In re Basis Yield Alpha Fund (Master)*, 381 B.R. 37, 40 (Bankr. S.D.N.Y. 2008). The burden of proof to establish the requirements for recognition rests on the foreign representative. *In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 389 B.R. 325, 334 (S.D.N.Y. 2008). For the reasons set forth below, recognition should be granted, if at all, only if Banorte's rights are expressly preserved and protected.

## I. USE OF CASH COLLATERAL WITHOUT ADEQUATE PROTECTION IS NOT PERMITTED UNDER THE AUTOMATIC RELIEF AVAILABLE UPON RECOGNITION UNDER SECTION 1520

27.     Mexicana should not be permitted to use the cash in the Collateral Accounts

without providing adequate protection to Banorte for any diminution in the value of the

collateral, because section 1520 of the Code expressly requires such adequate protection upon

recognition.

28.     In relevant part, section 1520 provides that:

> (a) Upon recognition of a foreign proceeding that is a foreign main proceeding
>
>    (1) *sections 361 and 362* apply with respect to the debtor that is within the territorial jurisdiction of the United States;
>
>    (2*) sections 363*, 549, and 552 apply to a transfer of an interest of the debtor in property that is within the territorial jurisdiction of the United States *to the same extent that the sections would apply to property of an estate*;
>
>    (3) unless the court orders otherwise, the foreign representative may operate the debtor's business and may exercise the rights and powers of a trustee under *and to the extent provided by sections 363* and 552. . . .
>
> 11 U.S.C. § 1520 (emphasis added).

29.     By the plain language of the statute, therefore, upon recognition of a foreign main

proceeding, section 1520 of the Code mandates that several sections of the Code, including

sections 361, 362 and 363, immediately become applicable to the property of a debtor within the

United States. 11 U.S.C. § 1520(a)(1)-(3).  While the implementation of these sections instantly

provides a foreign debtor these protections of the Bankruptcy Code, it also limits those

protections to the same extent they are limited in the Bankruptcy Code.  *In re Tri-Cont'l*

*Exchange Ltd.*, 349 B.R. 627, 639 (Bankr. E.D. Cal. 2006) (finding that "[a]n automatic

consequence of recognition of a foreign main proceeding is that § 363 applies. . . . As a consequence, cash collateral cannot be used without permission," and finding that, if the creditor did have an enforceable lien on certain funds, then those funds were cash collateral subject to the protection of 363, already in effect by virtue of recognition of the foreign main proceeding).

30.     Here, there is no dispute that the Collateral Accounts were pledged in favor of INB pursuant to the Security Agreement, were perfected by control pursuant to the Uniform Commercial Code of New York, are located in the United States and are subject to the jurisdiction of this Court.

31.     If the Court grants recognition, it should expressly state that the application of section 363 will require Mexicana's use or sale of property of the estate to be subject to section 363(c)(2), which prevents a trustee from using, selling, or leasing cash collateral without the consent of all who have interests in that collateral, or authorization from the Court after a finding that the secured party is adequately protected. 11 U.S.C. § 363(c)(2) – (d). *N.H. Bus. Dev. Corp. v. Cross Baking Co. (In re Cross Baking Co.)*, 818 F.2d 1027 (1st Cir. 1987).

## II.     RECOGNITION OF MEXICANA'S CONCURSO PROCEEDING BY THIS COURT PURSUANT TO CHAPTER 15 OF THE BANKRUPTCY CODE SHOULD BE CONDITIONED ON THE WITHDRAWAL OF THE STAY REINSTATEMENT ORDER BY THE MEXICAN COURT

32.     Furthermore, no attempt to "waive" or "carve out" Banorte solely from the stay in the chapter 15 proceeding, without likewise carving out Banorte from the Stay Reinstatement Order in Mexico, could possibly be considered adequate protection of Banorte's interest in the Collateral Accounts.[4]

---

[4]     Such a tactic also would not pass muster under the Bankruptcy Code if characterized as "discretionary relief under section 1521 of the Bankruptcy Code or as "additional assistance" under section 1507 of the Bankruptcy Code.

It fails as permissible discretionary relief because it does not provide Banorte with "sufficient protection" of its interests as a creditor pursuant to section 1522 of the Bankruptcy Code. Although the standards by

33.     As noted above, the Stay Reinstatement Order, among other things, purports to

*compel* INB to permit Mexicana to use funds in the Collateral Accounts, notwithstanding (1) the

entry of the Preliminary Injunction, which expressly left Banorte and INB free to exercise their

contractual rights and remedies, (2) that events of default under the Credit Agreement have

occurred and are continuing and (3) that Mexicana has entirely ceased all operations and cannot

show that its use of funds from the Collateral Accounts would not diminish the value of

Banorte's collateral.

34.     Additionally, the entry of the Stay Reinstatement Order exposes Banorte and INB

to the risk of liability in Mexico for exercising their contractual rights in the United States as

permitted by the orders of this Court.

35.     Banorte therefore objects to recognition unless this Court conditions any relief of

general applicability that it may grant to Mexicana upon recognition upon the immediate

withdrawal of adverse or contrary relief with respect to assets located in the United States that

---

which a court should ascertain "sufficient protection" under section 1522 of the Bankruptcy Code have
been only sparsely interpreted, it is difficult to imagine any interpretation of "sufficient protection" that
would prohibit a secured party from foreclosing on its cash collateral, while allowing a debtor to sweep
cash collateral at will, with no demonstrable means to replace it or otherwise compensate the secured party
for its use. This is particularly true in view of the "special protected status" enjoyed by secured creditors
under United States law, which can override interests of comity. *Treco v. Treco (In re Treco)*, 240 F.3d
148 (2d Cir. 2001) (in a case under section 304, the predecessor to chapter 15, finding that Bahamian
insolvency system allowing for payment of administrative claims prior to payment of secured creditors
might be a sufficient deviation from the U.S. bankruptcy code to prevent turnover of assets within the U.S.
to the foreign debtor).

It fails as permissible additional assistance because granting a debtor permission to use cash collateral
without providing adequate protection is not only not permitted under the Bankruptcy Code or other laws
of the United States, but also specifically violates the protections for secured creditors in sections 361-363,
embedded in section 1520 and the sufficient protection required in section 1522. Section 1507 is "intended
to permit the further development of international cooperation begun under section 304, *but is not the basis
for denying or limiting relief otherwise available under this chapter.*" *In re Atlas Shipping A/S*, 404 B.R.
726, 741 n.11 (Bankr. S.D.N.Y. 2009) (quoting H.R. Rep. No. 109-31, pt. 1 at 109 (2005))(emphasis added
in *In re Atlas*). Furthermore, permitting Mexicana to use Banorte's cash collateral to pay administrative or
other claims without compensation is both unjust and contrary to the distribution scheme prescribed by the
Bankruptcy Code. *See In re Treco*, 240 F.3d at 151(finding that Bahamian insolvency system allowing for
payment of administrative claims prior to payment of secured creditors might be a sufficient deviation from
the U.S. bankruptcy code to prevent turnover of assets within the U.S. to the foreign debtor).

has been, or may in the future be, granted by the Mexican Court. As discussed above, adequate protection of secured creditors is *required* by the plain language of chapter 15 and related parts of the Code. This Court is not required to, and should not, grant recognition if doing so would be manifestly contrary to this fundamental U.S. public policy. Even if the Debtor were to again attempt to "waive" or "carve out" Banorte from the recognition order, Banorte would not be adequately protected because its rights under the Code would be subject to attack in Mexico due to a standing and directly contrary order of the Mexican Court. Mexicana should not be permitted to gain the benefits of recognition in the United States without the accompanying burdens. That is what it has accomplished to date: it has manipulated the proceedings to obtain the protection of this Court, while avoiding this Court's scrutiny of its treatment of secured creditors by taking action in Mexico. If the words "adequate protection" are to have any meaning, secured creditors must not be exposed to retaliation in foreign jurisdictions for exercising their rights in the United States.

### A. The Stay Reinstatement Order is Manifestly Contrary to U.S. Public Policy Protecting Secured Creditors

36.     Recognition should be denied or made contingent on protecting Banorte and other secured lenders, because recognition is only permitted to the extent it is not "manifestly contrary" to the public policy of the United States. 11 U.S.C. § 1517 (an order granting recognition shall be entered, "[s]ubject to section 1506," chapter 15's public policy exception).

37.     Section 1506 limits recognition if recognition would be manifestly contrary to the public policy of the United States. *In re Metcalfe & Mansfield Alternative Invs.*, 421 B.R. 685, 697 (Bankr. S.D.N.Y. 2010) (Glenn, J.). Although this exception is to be "narrowly construed," the traditional protection of secured creditors in the United States, and in particular, the

protection of their cash collateral, is one such fundamental public policy. Any action "manifestly contrary" to that policy should not be taken by this Court.

38.     Recognition under chapter 15, without providing adequate protection to Banorte for its U.S. property both in the U.S. and abroad, would severely impinge Banorte's statutory and constitutional rights, and frustrate this Court's ability to administer the chapter 15 proceeding, while allowing Mexicana to reap the benefits of chapter 15 with respect to its other creditors and other assets in the United States.

### 1.     Statutory and Constitutional Right to Adequate Protection

39.     Banorte has a statutory right to secured creditor protections under section 1520 and its automatic incorporation of sections 361 through 363 of the Code. These statutory protections are part and parcel of the Bankruptcy Code, and are instrumental components of the administration of a chapter 15 proceeding. A court's recognition of a foreign insolvency proceeding that deprives a secured creditor of its property interest in its collateral may even give rise to a Takings Clause violation, under the Fifth Amendment to the U.S. Constitution. *In re Treco*, 240 F.3d at 161-62 (analyzing under section 304).

40.     While no court, post-chapter 15, has ruled on the specific question of whether a secured creditor's protection is a "fundamental policy," the issue was addressed in this circuit and elsewhere, analyzing the public policy exception to comity under the old section 304 regime. Such cases are instructive in the present determination.

41.     The leading case is *In re Treco*, in which the Second Circuit ruled that, if a creditor was in fact secured, comity could not be extended to a Bahamian insolvency proceeding to the extent that administrative expenses would be given priority over the interests of the secured creditor. 240 F.3d at 151. In making this determination, the court considered the "special protected status that secured creditors enjoy under United States law," and concluded

that "United States law affords strong protection to secured creditors and treats those protections very seriously, a conclusion that, in turn, amplifies the significance of the difference in the way secured claims are treated under Bahamian law." *Id.* at 159-60.

42.    In *Treco*, the Second Circuit also observed that several bankruptcy courts had likewise refused to grant relief under section 304 "where the priority of secured creditors was not recognized under the law of the foreign jurisdiction." *Id.* at 160; *see also In re Hourani*, 180 B.R. 58, 69 (Bankr. S.D.N.Y. 1995) (denying turnover where Jordanian law failed to distinguish between secured and unsecured claims); *In re Papeleras Reunidas, S.A.,* 92 B.R. 584, 593 (Bankr. E.D.N.Y. 1988) (denying § 304 relief where a judgment lien creditor would be treated as an unsecured creditor under Spanish law); *In re Toga Mfg. Ltd.*, 28 B.R. 165, 168-70 (Bankr. E.D.Mich. 1983) (denying turnover where a judgment lien creditor would be treated as an unsecured creditor under Canadian law)..

43.    Here, under the plain language of chapter 15 and other sections of the Code, and the Constitution, Banorte has a property interest in its collateral and substantial legal protections for that interest.  Prior courts have recognized the substantial nature of this interest, and have declined to grant comity or cooperation to foreign proceedings that would deny it.  To recognize the Mexico Proceeding without ensuring the protection of secured creditors would seriously impinge that right, and would frustrate this Court's ability to  administer the chapter 15 proceedings, as it would run directly counter to the statutory requirements of the chapter.

### 2.    Procedural Unfairness

44.    Furthermore, under the circumstances of this case, deference to the Concurso Proceeding would be procedurally unfair to Banorte, to the extent the unfairness is not cured by the adoption of additional protections.  In *Hilton v. Guyot*, the Supreme Court held that if the foreign forum provides "a full and fair trial abroad before a court of competent jurisdiction,

conducting the trial upon regular proceedings, after due citation or voluntary appearance of the defendant, and under a system of jurisprudence likely to secure an impartial administration of justice between the citizens of its own country and those of other countries, and there is nothing to show either prejudice in the court, or in the systems of laws under which it is sitting," the judgment should be respected and not "tried afresh." 159 U.S. 113, 202 (1895); *quoted in In re Metcalfe*, 421 B.R. at 698. Likewise, "when the foreign proceeding is in a 'sister common law jurisdiction with procedures akin to our own', comity should be extended with less hesitation, there being fewer concerns over the procedural safeguards employed in those foreign proceedings." *In re Bd. of Dirs. of Hopewell Int'l Ins. Ltd., Inc.*, 238 B.R. 25, 66 (Bankr. S.D.N.Y. 1999).

45.     Here, however, the Stay Reinstatement Order was entered *ex parte*, in a non-common law jurisdiction, in a proceeding in which Banorte was not invited to defend itself and was not given notice. Further, the Mexican Court issued the Stay Reinstatement Order after earlier assurances by the Debtor and the Mexican Court that Banorte was completely carved out from provisional relief in this case, and in complete contravention of this Court's Preliminary Injunction Order providing the same carve out.

46.     Unless cured by additional protections, recognition of the Concurso Proceeding would be procedurally unfair to Banorte, in addition to substantively violative of public policy.

47.     Section 1517 of the Bankruptcy Code expressly permits fundamental public policies to override concerns of comity where such policies would be threatened by the cooperation of U.S. courts. Banorte's right to adequate protection is one such fundamental policy, and this Court should not recognize Mexicana's foreign main proceeding unless and until

it can be assured that such adequate protection will be honored and not undermined by relief awarded in the Mexican Court..

**B.    Conditioning Recognition on the Withdrawal of the Stay Reinstatement Order is appropriate under the circumstances**

48.     Because the required adequate protections would be illusory if Mexicana were permitted to take action against Banorte in Mexico for seeking to protect its right to adequate protection in the United States, Banorte respectfully requests that this Court condition its grant of recognition on vacatur of the Stay Reinstatement Order as to Banorte, INB, and the Credit Card Servicers, and the requirement that Mexicana not seek or obtain any relief in Mexico or elsewhere that would undermine the adequate protection to which secured creditors are entitled.

49.     There is precedent for such relief, and it would be the only way to truly provide Banorte with its rights as a secured creditor in accordance with U.S. public policy. *See In re Bd. of Dirs. of Hopewell Int'l Ins. Ltd.*, 272 B.R. 396, 413 (Bankr. S.D.N.Y. 2002) (responding to a Bermudan court's injunction, contrary to the U.S. court's own injunction, by rendering the U.S. protections unenforceable so long as the Bermudan injunction remained in effect, and noting that merely refusing to recognize the Bermudan order would not be sufficient because it would leave the creditor "under threat of sanctions in Bermuda.").

50.     In order to better effectuate this relief, Banorte also respectfully requests that this Court exercise its power under section 1525(b), by which the Court "is entitled to communicate directly with, or to request information or assistance directly from, a foreign court or a foreign representative, subject to the rights of a party in interest to notice and participation." 11 U.S.C. § 1525(b). In *Muscletech Research & Dev. Inc. v. Aguilar (In re Ephedra Products Liability Litigation)*, the court persuaded the Canadian Monitor to request amendments to an order in the main proceeding that "conceivably could have been read as permitting the Claims Officer to

refuse to receive evidence and to liquidate claims without granting interested parties an opportunity to be heard." 349 B.R. 333, 335 (S.D.N.Y. 2006). These provisions disturbed the U.S. court, and through communication with the Canadian court, fundamental differences were resolved quickly and easily. *Id.* Banorte is hopeful that similar efforts, either through the Foreign Representative or through this Court's direct communication with the Mexican Court, the current impasse may be resolved

## CONCLUSION

51.     Chapter 15 is a relatively recent addition to the Code, and while it has the potential to greatly facilitate cross-border insolvencies, Mexicana has, from the inception of this case, leaned heavily on every weak joint of this young law to exploit the gaps where no case law has yet been written. Despite representations made to its secured creditors and this Court, Mexicana has aggressively sought contrary relief in different jurisdictions, and has failed to inform interested parties or, apparently, this Court, of material developments in its Mexican proceeding. It now seeks chapter 15's protection of its U.S. assets while denying its secured creditor the adequate protection to which it is entitled under those *very same provisions*. Fundamental policy interests of the United States forbid this treatment of secured creditors. Banorte's interests must be adequately protected, both in the U.S. and abroad, if Mexicana intends to utilize cash collateral located in the United States.

WHEREFORE, for the reasons set forth above, Banorte respectfully requests that the Court (1) determine and order that section 363 applies with respect to any attempt by Mexicana to use funds in the Collateral Accounts, irrespective of orders of the Mexican Court, (2) refuse to grant recognition to the Concurso Proceeding unless and until the orders of the Mexican Court asserting the Mexican Court's jurisdiction over the Collateral Accounts are withdrawn; (3) bar Mexicana from seeking or obtaining any relief in Mexico or elsewhere that

would undermine the adequate protection to which Banorte is entitled; (4) engage the Mexican

Court in communications to ensure the protection of secured creditors in both proceedings; and

(5) grant such other or further relief as is just and proper.

Dated:    New York, New York
           September 1, 2010

Respectfully submitted,

Linklaters LLP

By:    /s/ Paul Hessler
        Martin N. Flics
        Paul S. Hessler
1345 Avenue of the Americas, 19th Floor
New York, NY 10105
(212) 903-9000
(212) 903-9100 (fax)
martin.flics@linklaters.com

*Attorneys for Banco Mercantil del Norte, S.A.*